**RECORD IMPOUNDED**

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-2565-15T2

NEW JERSEY DIVISION OF CHILD
PROTECTION AND PERMANENCY,

    Plaintiff-Respondent,

v.

T.U.B.,

    Defendant,

and

J.E.C.,

    Defendant-Appellant.

_____

IN THE MATTER OF THE GUARDIANSHIP
OF C.I.B., a Minor.

_____

┌─────────────────────────────┐
│   **APPROVED FOR PUBLICATION**  │
│                             │
│        **May 22, 2017**         │
│                             │
│     **APPELLATE DIVISION**      │
└─────────────────────────────┘

Argued April 24, 2017 — Decided May 22, 2017

Before Judges Sabatino, Currier and Geiger.

On appeal from Superior Court of New Jersey,
Chancery Division, Family Part, Essex
County, Docket No. FG-07-164-14.

James Gentile, Designated Counsel, argued
the cause for appellant (Joseph E. Krakora,
Public Defender, attorney; Mr. Gentile, on
the briefs).

Michelle Cort-Hourie, Deputy Attorney
General, argued the cause for respondent
(Christopher S. Porrino, Attorney General,
attorney; Andrea M. Silkowitz, Assistant

Attorney General, of counsel; Ms. Cort-Hourie, on the briefs).

James A. Louis, Deputy Public Defender, argued the cause for minor C.I.B. (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Danielle Ruiz, Designated Counsel, on the briefs; Mr. Louis and Olivia Belfatto Crisp, Assistant Deputy Public Defender, on the brief).

J. David Pollock argued the cause for amicus curiae John J. Gibbons Fellowship in Public Interest and Constitutional Law at Gibbons, P.C. (Gibbons P.C., attorneys; Lawrence S. Lustberg and Mr. Pollock, on the brief).

The opinion of the court was delivered by

SABATINO, P.J.A.D.

This appeal by a father from a final judgment terminating his parental rights in a <u>Title</u> 30 guardianship case raises an important and recurring legal issue of statutory construction. The issue is whether the special evidentiary provision for <u>Title</u> 9 cases codified at <u>N.J.S.A.</u> 9:6-8.46(a)(4), allowing the admission of certain hearsay statements by children about corroborated allegations of abuse or neglect, likewise applies in <u>Title</u> 30 guardianship cases involving the termination of parental rights. That hearsay exception reads, in pertinent part, as follows:

> In any hearing under this act, including an administrative hearing held in accordance with the 'Administrative Procedure Act,' <u>P.L.</u> 1968, <u>c.</u> 410 (C. 52:14B-1 et seq.), . . . (4) previous statements made by

> the child relating to any allegations of abuse or neglect shall be admissible in evidence; provided, however, that no such statement, if uncorroborated, shall be sufficient to make a fact finding of abuse or neglect.
>
> [N.J.S.A. 9:6-8.46(a)(4).]

For the reasons that follow, we conclude that the plain meaning of this statutory provision confines the use of this special pathway for the admission of hearsay by children to Title 9 proceedings and does not extend to Title 30 guardianship trials involving the termination of parental rights. We reach this conclusion mindful that this hearsay exception has been mistakenly applied at times in the past in some Title 30 termination proceedings, albeit apparently without the benefit of the rigorous legal analysis and advocacy that have been provided to us by counsel in this appeal. We are also mindful that the Legislature retains the ability to adopt a curative amendment to Title 30 to extend the hearsay exception in N.J.S.A. 9:6-8.46(a)(4) to future termination proceedings, if it chooses to do so in the wake of this opinion.

The trial court in this case impermissibly relied upon hearsay statements by children that it admitted, over objection, under N.J.S.A. 9:6-8.46(a)(4). The hearsay involved allegations of sexual abuse that were later in part recanted by one of the non-testifying child declarants. The trial court accepted the

truth of those allegations, which were not directly corroborated by independent admissible proof that defendant did, in fact, sexually assault the girls.

The evidential error appears to have affected the trial court's assessment of whether the Division of Child Protection and Permanency ("the Division") met its burden of proof on prongs one, two, and four of the termination criteria under N.J.S.A. 30:4C-15.1(a) by clear and convincing evidence. We therefore vacate the final judgment with respect to those three prongs, and remand for the trial court to reconsider its decision without reference to or reliance upon the sexual abuse hearsay. We affirm, however, the court's discrete findings with respect to prong three concerning the provision of services and the absence of other suitable relatives to serve as caretakers.

I.

This case hinges upon the trial court's admission and reliance upon highly inculpatory hearsay statements of two non-party female minors, J.H. ("Jenny") and S.C. ("Sandy"),[1] who did not testify at the Title 30 guardianship trial. The girls alleged that acts of sexual abuse were committed against them by

_____

[1] We use initials and fictitious names to protect the identity and privacy of the minors and other persons involved in this case.

defendant J.E.C. during a time frame when defendant and his minor son C.I.B. ("Calvin") were living in their household with the girls' mother, defendant's girlfriend, T.C.

The Background

Calvin was born in May 2008. His biological mother is T.U.B., and his biological father is defendant. T.U.B. is the biological mother of eight additional children with other fathers. Defendant himself has two other children, one of whom is an adult. Neither of his other children lived with him at the times relevant to this case, and they are not the subject of this litigation.

Before Calvin's birth, the Division had received several reports of parental abuse and neglect of T.U.B.'s children in her house. In November 2007, the Division conducted an emergency "Dodd" removal[2] of five of T.U.B.'s children from her home. The Division received a sixth referral in May 2008 concerning T.U.B. shortly after Calvin was born, but allowed Calvin to remain in her home while she was offered services.

About a year later, in May 2009, T.U.B. brought Calvin to live with defendant and his paramour T.C., because T.U.B. was

---

[2] A Dodd removal is an emergent removal of a minor without a court order pursuant to N.J.S.A. 9:6-8.21 to -8.82 known as the Dodd Act. N.J. Div. of Youth & Fam. Servs. v. P.W.R., 205 N.J. 17, 26 n.11 (2011).

unable to continue to keep Calvin in her mother's apartment. The parents entered at that time into a case plan with the Division, agreeing that Calvin would remain in defendant's physical custody. Not long after that, defendant was granted temporary physical custody of Calvin, with T.U.B.'s consent.

Eventually, in May 2010, T.U.B. voluntarily surrendered her custodial rights over Calvin. Meanwhile, Calvin continued to reside with defendant, T.C., T.C.'s two daughters, Jenny and Sandy, and her minor son.[3]

The Two Girls' Allegations of Sexual Abuse

In the latter part of 2010, Jenny, who was then eleven years old, reported to a teacher that defendant had been sexually abusing both her and her sister Sandy on multiple occasions over a period of several years. Upon learning of these allegations, the Division arranged a psychosexual evaluation of defendant by a psychological expert, Barry A. Katz, Ph.D.

In his written report from 2010 based on the Division's files, Dr. Katz noted there were "significant and extensive contradictions in [Jenny's] reporting regarding the abuse." Jenny initially reported that she had been raped by defendant.

---

[3] The facts and issues in the present litigation do not concern T.C.'s minor son.

However, she later informed a caseworker that defendant had "touched [the] inside of her panties." She separately told hospital staff that he had only touched her over her clothing and that nothing further had happened. In addition, Dr. Katz noted that both Sandy and Jenny's father had denied Jenny's claims that defendant had also molested Sandy and that the two girls had fled T.C.'s home to go to Jenny's father's house. Moreover, medical evaluations of the girls revealed no signs of bruising, trauma, or injury.

Defendant was not criminally charged with sexual wrongs or any other offenses. However, the Division administratively substantiated him for sexual molestation of Jenny. He denied, and continues to deny, engaging in any sexual abuse of Jenny or Sandy.

Dr. Katz stated in his 2010 report that there was "no reliable data . . . to indicate that [defendant was] a current risk of sexually acting out on a child." Based on the information then available to him, Dr. Katz found "insufficient evidence to conclude that [defendant] was a danger to a child in his care." By way of qualification, Dr. Katz did comment that "[a]dditional data would be helpful and relevant to increasing the accuracy of [his] assessment." That information could include details of the family's past involvement with the

Division, results of diagnostic evaluations of the children, details of defendant's criminal history, and a copy of Jenny's personal journal in which she had reportedly discussed the abuse.

In May 2012, the Division received a referral reporting that a physical altercation had taken place at T.C.'s home between defendant and Sandy's biological father, T.J. T.J. informed Division investigators that he had struck defendant because he had been told that defendant had molested the girls. The Division accordingly interviewed Sandy and Jenny, both of whom claimed in their interviews to have been sexually abused by defendant.

Proceedings in the Family Part and Related Developments

In June 2012, a judge in the Family Part awarded the Division the care and supervision, but not custody, of T.C.'s children. Defendant was ordered to stay out of T.C.'s home. The court apparently was not aware that Calvin was also residing in T.C.'s home at the time.

On June 22, 2012, the Division received a referral from an East Orange police officer, stating that she had responded to T.C.'s home where T.U.B. had gone to take physical custody of Calvin. The officer had taken T.C. and Calvin to the police station because T.U.B., who had not seen Calvin for more than a

year, was demanding custody, and defendant's whereabouts were then unknown. T.U.B. reported that she had received a message on social media about the fight between T.J. and defendant. T.U.B. further claimed that she had seen messages between defendant and Sandy. The messages indicated to T.U.B. they were in a relationship, and that Sandy had been pregnant and had an abortion.[4]

The Division at that point conducted a Dodd removal of Calvin from T.C.'s residence. It took that action because (1) defendant's whereabouts were unknown, (2) T.C. was not the legal guardian of Calvin, and she had an open case with the Division, and (3) T.U.B. did not have residential custody of Calvin, had a significant history herself with the Division, and had care and custody of only three of her eight biological children.

Four days later, the Division filed a complaint for custody of Calvin, which the Family Part granted. The judge ordered weekly supervised visitation with Calvin for all defendants, including T.C. The Division referred defendant to a supervised visitation program at Reunity House in East Orange. That program included weekly therapeutic supervised visitation and weekly parenting skills group sessions. The Division also

---

[4] The messages were not moved into evidence, so there was no appropriate proof of their contents. See N.J.R.E. 1002.

offered transportation.

In August 2012, Calvin was evaluated at the Metro Regional Diagnostic and Treatment Center ("RDTC") at Children's Hospital of New Jersey. The RDTC reported that Calvin was "developmentally delayed in communication skills, fine motor skills, problem solving skills, and personal social skills." The RDTC also noted that Calvin's resource parent had reported he displayed "significant emotional and behavioral problems including temper tantrums, defiance, and oppositionality."

In September 2012, Calvin was again evaluated by the RDTC, which concluded he exhibited "[s]low growth — possible failure to thrive." The RDTC recommended that Calvin continue to see a nutritionist, and that defendant participate in the visits and receive parenting skills training to "improve [Calvin's] eating behaviors and food intake," and to work on disciplinary skills.

In November 2012, the scheduled date for a fact-finding hearing, the Division requested that the Title 9 allegations be withdrawn and the matter go forward instead under Title 30. The Family Part consequently ordered that the matter "proceed pursuant to Title 30 as child welfare concerns exist[ed] and the family [was] in need of . . . services." The court advised counsel that at the next hearing it would "consider whether [Calvin] should be immediately placed with [T.C.]."

On November 13, 2012, the Division received a report that defendant was then living at T.C.'s house, despite the court's outstanding order prohibiting him from doing so. However, the girls, T.C.'s son, T.C., and defendant all denied that he was residing there. During its investigation, the Division learned that Jenny was not registered for school. T.C. was accordingly substantiated for educational neglect.

A week later, the Division received a second referral, which reported that defendant had been residing in T.C.'s home for over a month. Although T.C., Jenny, and Sandy denied that defendant was living there, T.C.'s son privately told a Division supervisor, Ines Perez-Nin, that defendant had been staying at the home two nights a week. Because defendant had been court-ordered to remain out of T.C.'s home, the children were accordingly removed by the Division from T.C.'s care on November 26, 2012.

The following day, Perez-Nin interviewed Jenny and Sandy. Both girls confirmed to her that defendant had been residing in T.C.'s home. In addition, Jenny stated to Perez-Nin that defendant had been sexually abusing her since she was seven years old. Sandy, meanwhile, told Perez-Nin that she had been having sex with defendant three to four times per week. Sandy further revealed that she had become pregnant the previous year,

and that defendant had taken her to get an abortion.[5]

Additional Expert Evaluations

The Division thereafter referred defendant for an evaluation by Dr. Mark Singer, a licensed psychologist, in April 2013. During that evaluation, defendant "denied ever engaging in inappropriate sexual contact with any minor [or] taking any minor for any medical procedure related to termination of pregnancy." Dr. Singer recommended that defendant complete parenting skills training, and that he also participate in individual therapy.

In addition, the Division referred defendant for a psychosexual reevaluation, which was again performed by Dr. Katz in July 2013. In his updated 2013 report, Dr. Katz noted that when asked if he had taken Sandy for a medical procedure, defendant stated that he had taken her to a hospital, and the doctor there told him that she had a cyst on her ovary and

_____

[5] At defendant's later guardianship trial, the Division admitted into evidence, without objection from defense counsel, the medical records from that abortion procedure. The records, supplied with a certification from the medical office, reflected that defendant, posing as Sandy's father, had accompanied her to the abortion and provided consent for the fourteen-year-old to have the procedure. The record reflects that Sandy told the clinic that she was pregnant because of her "boyfriend [who] is [the] same age . . . [and] he did not make her have sex with him." As such, the record by its terms does not corroborate that defendant sexually abused Sandy, although we recognize the possibility that defendant could have persuaded Sandy to fabricate that her boyfriend had gotten her pregnant.

A-2565-15T2

surgery was performed the same day. Defendant told Dr. Katz that he had taken Sandy for surgery because T.C. could not drive, and she was watching her other children and Calvin. He also admitted signing the medical consent form, even though he was not Sandy's guardian.

Dr. Katz noted in his reevaluation that there was "sufficient evidence to conclude that there [were] concerns regarding the risk that [defendant] may pose to a child in his care." Further, he stated that "[if] the children's reports [were] accurate, then it would indicate that [defendant was] a moderate risk offender."

Dr. Katz considered defendant to be "a lower risk to a child in the community, but a higher risk to a child placed in his care." He acknowledged that additional data would be relevant to increasing the accuracy of his assessment, including a criminal history for defendant, a copy of Jenny's journal, and relevant hospital records for the children. Dr. Katz recommended that defendant not have unsupervised visitation until such additional data was collected and reviewed, and that defendant engage in therapy with a professional competent in treating sexual offenders.

The trial court ordered defendant to comply with the recommendations from Dr. Katz's psychosexual reevaluation.

However, defendant resisted doing so, arguing that the Division had not provided sufficient proof of the sexual abuse allegations.

Defendant was discharged from the Reunity House program for inconsistent attendance. He also missed numerous parenting skills classes. In addition, defendant was inconsistent in attending supervised visits with Calvin, and he eventually stopped visits altogether. At a family team meeting in April 2014, defendant did agree to comply with parenting skills classes, individual therapy, and supervised visitation. Again, he did not follow through.

Meanwhile, Calvin's resource parent withdrew her interest in adopting him after having initially expressed interest in doing so. The Division consequently changed its plan for Calvin to "select home adoption," anticipating the possibility that a different adoptive parent or family might materialize.[6]

Although T.U.B. temporarily sought custody of Calvin, that effort ultimately failed when she lost her housing, and she, too, did not visit him. At an October 2014 permanency hearing,

---

[6] The resource parent later renewed her interest in becoming an adoptive parent. However, as of the time of oral argument of this appeal, counsel confirmed to us that Calvin's status was "select home adoption," there being no adoptive parent presently in the wings.

the trial court consequently approved the Division's plan to terminate the parental rights of both defendant and T.U.B.

<u>The Guardianship Trial and Defendant's Hearsay Objections</u>

The lengthy guardianship trial took place over ten intermittent trial days from February 2015 through January 2016. The Division presented expert testimony from Dr. Elizabeth M. Smith, a licensed psychologist, and Dr. Katz. The Division also presented factual testimony from caseworker Emerald Irby and supervisor Perez-Nin, who recounted the Division's investigation and efforts concerning Calvin and the family. The alleged victims of sexual abuse, Jenny and Sandy, did not testify. None of the testifying witnesses had any personal knowledge regarding the truth of the girls' sexual abuse allegations.

During the course of the trial, defendant's counsel objected to the admission of the hearsay allegations of sexual abuse by Jenny and Sandy contained in four of the Division's exhibits, specifically P-22, P-53, P-58, and P-122. The Division countered that the girls' hearsay allegations were admissible under <u>N.J.S.A.</u> 9:6-8.46(a)(4), and that they had been sufficiently corroborated.

After considering written arguments by the parties, the trial judge overruled defendant's objection. The judge reasoned that <u>Title</u> 9 and <u>Title</u> 30 should be "construed together as a

A-2565-15T2

unitary and harmonious whole" and, therefore, the hearsay exception of N.J.S.A. 9:6-8.46(a)(4) was applicable to this termination proceeding. The judge clarified that the admission of the girls' hearsay statements did not diminish the Division's ultimate burden of establishing the criteria for termination by clear and convincing proof. Defendant later objected to similar hearsay from the girls being presented through testimony from Perez-Nin, an objection which the court likewise overruled.

The subject of the girls' sexual abuse allegations was addressed at considerable length in Dr. Katz's trial testimony. Dr. Katz acknowledged that when he had conducted defendant's initial evaluation five years earlier in November 2010, he found it significant that Jenny had recanted parts of her allegations and that there was "non-corroborating information in the record about her reporting." Even so, Dr. Katz pointed out that it was not uncommon for victims to recant abuse allegations, "especially when other family members may not believe or be supportive of the allegation."

Dr. Katz went on to discuss his reevaluation of defendant in July 2013, which included the allegation that defendant had taken Sandy to get an abortion. As a preliminary point, Dr. Katz found it significant that defendant had violated a court order by returning to T.C.'s home. The expert also noted that

defendant had provided contradictory responses about whether he had taken Sandy to a medical facility for the purpose of an abortion.

Later during Dr. Katz's trial testimony, the Division questioned him about Sandy's medical records from her abortion, documents he had not reviewed earlier for his 2013 report. Dr. Katz testified that those records, in his opinion, did "corroborate [Sandy's] report and contradict [defendant's] report as well as corroborate her allegation of this sexual abuse." He testified these records were "significant" because the corroboration of Sandy's abortion account "would confirm and strengthen the opinions of the 2013 report and given much greater confidence regarding the child's reporting regarding — and raising [defendant's] risk." Dr. Katz concluded that based on these records, defendant could not provide a safe home now or in the foreseeable future.

The Law Guardian did not introduce evidence nor offer any witnesses at trial. Nor did T.U.B., who did not appear at trial.[7]

---

[7] As we have noted, T.U.B. executed an identified surrender of her parental rights before the trial, but the court later vacated T.U.B.'s surrender after Calvin was removed from his foster parent. For a period of time, T.U.B. participated in visitation with Calvin, but she ultimately became noncompliant. The Division presented evidence at the guardianship trial
(continued)

In his own case-in-chief, defendant called Laura Montgomery, a licensed clinical social worker who was Calvin's therapist, and attempted to call T.C. Montgomery testified that, in response to an inquiry from Perez-Nin, she had recommended that visitation for defendant not be reinstated because she believed the visits would be disruptive to Calvin. Defendant argued in summation that Montgomery's testimony helped to explain, in a benign manner, why he had stopped visiting Calvin.

Over the Division's objection, defendant proffered that T.C. would provide limited testimony that Jenny was currently residing with defendant and T.C., allegedly with no problems. Defense counsel argued such testimony from T.C. would be relevant "in large part due to allegations that [defendant] sexually assaulted" Jenny.[8]

The judge disagreed, and excluded T.C.'s testimony. She ruled that the sexual abuse allegations were not the "only" allegations against defendant, and that by allowing T.C. to

_____

(continued)
specifically tailored to T.U.B., and ultimately the judge terminated her parental rights as well as defendant's. T.U.B. has not appealed her termination.

[8] Although the Law Guardian supported the termination of defendant's parental rights, she agreed with defense counsel that T.C. should be permitted to testify.

testify it would "open[] up a can of worms." The judge found where Jenny was then currently living was not "part of this case," and that T.C.'s testimony would "open[] up many things going back to the allegations of the sexual abuse which are not part of this hearing."

Defendant did not present any further evidence, and he did not testify.

### The Trial Court's Termination Decision

The trial judge issued a lengthy written opinion on February 10, 2016, concluding that the Division had met its burden by clear and convincing evidence to satisfy all four prongs for termination set forth in N.J.S.A. 30:4C-15.1(a).

With respect to the first prong of proven endangerment, N.J.S.A. 30:4C-15.1(a)(1), the judge commented on several things. First, the judge noted that Calvin had been removed by the Division from the home because defendant's whereabouts were then unknown. She found it significant that defendant had improperly left Calvin in T.C.'s care, even though she did not have legal custody over him and had no authority to act as his custodian in an emergency situation. The judge also noted that Calvin had developmental delays and other special needs, which were not being addressed until the Division had intervened.

Most significantly with respect to the present appeal, the

trial judge emphasized that defendant was "a [s]ubstantiated perpetrator of sexual abuse." The judge accepted as true the hearsay allegations of Jenny and Sandy concerning that alleged abuse.

Specifically, the judge found that defendant's behavior "in repeatedly sexually abusing [Jenny and Sandy] three to four times a week each . . . demonstrate[d] a consistent pattern of egregious acts of abuse or neglect that [the court could] not and [would] not ignore." (Internal quotation omitted). She added that the court did "not need to wait for [defendant] to continue his pattern of egregious child abuse by making [Calvin] his next victim."[9] The judge also noted the risks of re-offense by defendant identified in Dr. Katz's evaluations and trial testimony, as well as his failures to comply with therapy and other programs that might address and abate those risks.

Apart from these facets relating to the alleged sexual abuse, the judge also underscored defendant's failure to attend parenting skills classes and avail himself of other services

---

[9] At oral argument on appeal, the Deputy Attorney General acknowledged that there is no specific evidence in the record that this defendant has a proclivity to sexually abuse a male child. Nor is there evidence in the record that defendant sexually abused either of the two girls in Calvin's presence. That said, we by no means discount the serious potential risks of harm to Calvin if the allegations of sexual abuse by the minor females are indeed true.

offered by the Division. The judge lamented defendant's repeated failures to attend supervised visitations with Calvin, noting that defendant had not visited his son since April 2014, a gap of almost two years. She also pointed out defendant's failure to obtain suitable housing. The judge credited Dr. Smith's testimony that these failures had contributed to Calvin's ongoing behavioral issues. The judge specifically found that Calvin had "endured great emotional harm due to being displaced from his parents for over three years[.]"

These findings as to prong one supplied corresponding support for the judge's conclusion on prong two that defendant was unwilling or unlikely to eliminate the risk of harm to Calvin in the future. N.J.S.A. 30:4C-15.1(a)(2). On this prong, the judge again pointed to, among other things, defendant's failures to comply with the therapy and other services, participate in visitation, obtain stable housing separate from T.C., and participate in a bonding evaluation.

Addressing the third prong of the termination statute, N.J.S.A. 30:4C-15.1(a)(3), the judge concluded that the Division had made reasonable efforts to provide services to defendant and Calvin. In addition, she found under prong three that "[t]he Division fully assessed the relative caretakers that were offered and all were ruled out."

Finally, the judge concluded under the fourth prong of the statute that termination of defendant's parental rights would not do Calvin more harm than good. N.J.S.A. 30:4C-15.1(a)(4). In this regard, she expressly concluded that that there was "no realistic likelihood that [defendant would] be able to safely and appropriately care for [Calvin] now or in the foreseeable future."

Again referring to the allegations of sexual abuse, the judge emphasized on prong four that defendant had "not demonstrated a commitment to addressing his deviant sexual behavior and poor parenting skills which pose a risk of harm to [Calvin]." She emphasized that defendant had "failed to complete any services that address[ed] his [s]ubstantiation for child sexual abuse [and] ha[d] not attended parenting skills [classes] which would have assisted [him] in learning how to parent [Calvin], a child with medical and behavioral issues." The judge reiterated that defendant had failed to visit Calvin. She noted that both testifying experts, Dr. Katz and Dr. Smith, had opined that defendant's parental rights should be terminated. Lastly, the judge emphasized Calvin's strong need for permanency.

Defendant thereafter filed the present appeal, which both the Division and the Law Guardian oppose.

Although defendant argues the trial court's findings on all four criteria for termination are flawed for numerous reasons, his main legal point concerns the court's admission over objection, and its reliance upon, the hearsay allegations of sexual abuse conveyed by T.C.'s minor daughters, Jenny and Sandy.

Defendant submits that, as a matter of law, the hearsay exception adopted by the Legislature and codified at N.J.S.A. 9:6-8.46(a)(4) applies only in child abuse-or-neglect proceedings litigated under Title 9. He contends that the hearsay exception does not apply to termination of parental rights cases litigated, as here, under Title 30, a context in which the stakes for a parent are markedly higher and in which the Division's burden of proof is more stringent.

Defendant asserts the trial court erred in overruling his repeated objections to the minors' hearsay statements. He maintains that the court further erred in relying on the truth of those allegations in its analysis of the statutory predicates for termination. He argues that these errors were not harmless, and that he is entitled to a new guardianship trial.

Defendant is joined in his arguments for reversal by amicus curiae, The John J. Gibbons Fellowship in Public Interest and

Constitutional Law. As a contingent argument, amicus contends that the trial court's admission and reliance upon the minors' hearsay statements deprived defendant of his constitutional rights of due process of law.

In response, the Division and the Law Guardian contend that the Legislature did not intend to confine the hearsay exception in N.J.S.A. 9:8-46(a)(4) to Title 9 proceedings, and that the provision equally applies to Title 30 guardianship trials. They assert that Title 9 and Title 30 are to be construed "in para materia." Consequently, they urge that the special hearsay exception designed to ease the Division's evidentiary burden in Title 9 cases should logically apply likewise in Title 30 guardianship proceedings. Respondents also point out that our trial and appellate courts have applied the Title 9 hearsay exception to termination cases in several prior unreported opinions.

Further, as a policy matter, the Division contends in its own brief that it will impose undue burdens on the Division and upon abused children to disallow their hearsay statements and require them to testify in court at Title 30 trials. Alternatively, the Division argues that the girls' statements in this case about the alleged sexual abuse were admissible under N.J.R.E. 703 through the expert testimony of Dr. Katz. The

24

Division further argues that, even if the hearsay statements of T.C.'s daughters are disregarded, there is ample independent evidence in the record to support the trial court's findings as to the four termination factors. The Law Guardian at oral argument echoed these contentions.

A.

For proper context, we present the full current text of N.J.S.A. 9:6-8.46(a). The portion of the statute at the crux of this appeal appears in subsection (a)(4):

> a. In any hearing under this act, including an administrative hearing held in accordance with the "Administrative Procedure Act," P.L. 1968, c. 410 (C. 52:14B-1 et seq.), (1) proof of the abuse or neglect of one child shall be admissible evidence on the issue of the abuse or neglect of any other child of, or the responsibility of, the parent or guardian and (2) proof of injuries sustained by a child or of the condition of a child of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or guardian shall be prima facie evidence that a child of, or who is the responsibility of such person is an abused or neglected child, and (3) any writing, record or photograph, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any condition, act, transaction, occurrence or event relating to a child in an abuse or neglect proceeding of any hospital or any other public or private institution or agency shall be admissible in evidence in proof of that condition, act, transaction, occurrence or event, if the judge finds that it was made in the regular course of the business of any hospital or any other public

or private institution or agency, and that it was in the regular course of such business to make it, at the time of the condition, act, transaction, occurrence or event, or within a reasonable time thereafter, shall be prima facie evidence of the facts contained in such certification. A certification by someone other than the head of the hospital or agency shall be accompanied by a photocopy of a delegation of authority signed by both the head of the hospital or agency and by such other employees. All other circumstances of the making of the memorandum, record or photograph, including lack of personal knowledge of the making, may be proved to affect its weight, but they shall not affect its admissibility and <u>(4) previous statements made by the child</u>[10] <u>relating to any allegations of abuse or neglect shall be jadmissible in evidence; provided, however, that no such statement, if uncorroborated, shall be sufficient to make a fact finding of abuse or neglect</u>.

---

[10] The statute does not define who can qualify as "the child" whose statements are eligible for this hearsay exception. In particular, it is unclear whether "the child" under subsection (a)(4) can be a non-party hearsay declarant who is <u>not</u> a child of the defendant parent or guardian whose rights are at issue. The parties have not briefed this specific question. At oral argument on the appeal, the Deputy Attorney General suggested that the term "the child" in subsection (a)(4) pertains to <u>any</u> child, pointing to subsection (a)(1)'s reference to proof of the abuse or neglect of one child being admissible as proof of the abuse or neglect of another child. See <u>N.J.S.A.</u> 9:6-8.46(a)(1). However, subsection (a)(1) does not say that <u>hearsay</u> or <u>inadmissible</u> proof of abuse as to one child is admissible to support this other-child inference. In any event, because this discrete sub-issue has not been briefed, we shall assume, but not decide, that the term "child" does extend to non-party children such as Jenny and Sandy in this case. See <u>Sklodowsky v. Lushis</u>, 417 <u>N.J. Super.</u> 648, 657 (App. Div. 2011) (expressing our general reluctance to address issues that were not briefed on appeal).

[<u>N.J.S.A.</u> 9:6-8.46(a) (emphasis added).]

In construing the meaning of these provisions, we are guided by longstanding principles of statutory construction. When interpreting a statute, a court's primary goal is to give effect to the intent of the Legislature. <u>In re N.B.</u>, 222 <u>N.J.</u> 87, 98 (2015). "[T]he best indicator of that intent is the plain language chosen by the Legislature." <u>Ibid.</u> (alteration in original) (quoting <u>State v. Gandhi</u>, 201 <u>N.J.</u> 161, 176 (2010)). "[W]ords and phrases shall be read and construed with their context, and shall, unless inconsistent with the manifest intent of the Legislature or unless another or different meaning is expressly indicated, be given their generally accepted meaning, according to the approved usage of the language." <u>N.J.S.A.</u> 1:1-1; <u>accord</u> <u>N.B.</u>, <u>supra</u>, 222 <u>N.J.</u> at 98.

"If the statute is clear and unambiguous on its face and admits of only one interpretation, [a court] need delve no deeper than the act's literal terms to divine the Legislature's intent." <u>State v. Butler</u>, 89 <u>N.J.</u> 220, 226 (1982); <u>accord</u> <u>Gandhi</u>, <u>supra</u>, 201 <u>N.J.</u> at 180-81. "A court may neither rewrite a plainly-written enactment of the Legislature nor presume that the Legislature intended something other than that expressed by way of the plain language." <u>O'Connell v. State</u>, 171 <u>N.J.</u> 484, 488 (2002).

That said, where there is more than one plausible interpretation, or where a literal reading of the statute would yield an absurd result, a court may turn to extrinsic evidence to assist in its interpretation of legislative intent. N.B., supra, 222 N.J. at 98-99; see also Wilson ex rel. Manzano v. City of Jersey City, 209 N.J. 558, 572 (2012). Such extrinsic evidence may include, for example, a statute's legislative history, committee reports, and the law's contemporaneous construction. N.B., supra, 222 N.J. at 98; see, e.g., DiProspero v. Penn, 183 N.J. 477, 492-93 (2005) (examining such extrinsic aids, including pertinent legislative history, in construing the meaning of a contested aspect of the Automobile Insurance Cost Saving Reform Act).

Applying those principles of construction here, we conclude that the plain meaning of the terms of N.J.S.A. 9:6-8.46(a)(4) is to confine that discrete hearsay exception to abuse-or-neglect cases litigated in Title 9 proceedings. The Title 9 provision simply does not apply in Title 30 termination cases, even though that inapplicability may pose evidential difficulties for the Division in such matters.

### B.

A key factor that informs our plain-meaning analysis is that the hearsay exception in question appears only in Title 9

of our State's statutes.  It is not repeated or incorporated by reference anywhere within Title 30.  Significantly, the first line of subsection (a) of N.J.S.A. 9:6-8.46 begins with this contextual and limiting phrase: "In any hearing under this act . . . ." (Emphasis added).  By using the prefatory term "this act," the Legislature plainly conveyed that the evidentiary provisions set forth within subsection (a)(1) through (4) are all special rules intended to override or qualify the general rules of evidence, but for Title 9 proceedings only.

Although we need not necessarily consider extrinsic sources, the relevant legislative history reinforces this conclusion about the plain meaning of the statute.  Throughout the history of our State's codified child welfare laws, the Legislature has repeatedly addressed abuse or neglect proceedings and proceedings to terminate a parent's rights in separate portions of the New Jersey statutes.

Before 1951, the child welfare laws in our State were fundamentally criminal in nature.  The Legislature first codified child welfare penalties in L. 1915, c. 246.  The Act, spanning ten sections, criminalized such conduct as child abuse, abandonment, neglect, and cruelty.  Ibid.  Although civil aspects were present (such as provisions for a child's placement

following a defendant's conviction), the Act contained mostly criminal components, including the possibility of jail time of up to one year.  Ibid.

In 1939, the Legislature amended Title 9 to enable other entities apart from prosecutors, such as school boards, municipalities, and private child welfare organizations, to "prefer a complaint" for suspected child abandonment, abuse, neglect, or cruelty.  L. 1939, c. 277.  That enactment stated that such bodies, by filing such complaints, may "cause to be arrested and prosecuted any person who shall offend against" the chapter's provisions.  Ibid.

A State agency to administer child welfare cases was statutorily created in Title 30 by L. 1951, c. 138, codified at N.J.S.A. 30:4C-1, -2.  The agency's name has changed over the years and is currently known as the Division of Child Protection and Permanency.  "[F]or all purposes [the Division is] deemed a continuation" of previous State child welfare agencies. N.J.S.A. 30:4C-2.1.

As adopted in 1951, Chapter 138 largely established the modern framework and contents of Title 30.  The enactment consisted of forty sections.  L. 1951, c. 138.  Specifically, the statute concerned "the care, custody, guardianship, maintenance and supervision of dependent and neglected

children[.]" __Ibid.__ Although the statute was mostly about guardianship matters, the Act also directed the new State agency to administer __Title__ 9. __Id.__ at § 4. Among other things, __Chapter__ 138 empowered the agency to file a complaint for guardianship after a __Title__ 9 abuse or neglect determination. __Id.__ at § 15.

In 1971, and again in 1974, the Legislature enacted two major overhauls that largely govern today's abuse or neglect ("FN") docket in __Title__ 9 proceedings. First, __L.__ 1971, __c.__ 437, was passed "for the protection of children under 18 years of age who have had serious injury inflicted upon them by other than accidental means." That 1971 statute inserted eight new sections into __Title__ 9, so as "to assure that the lives of innocent children are immediately safeguarded from further injury and possible death and that the legal rights of such children are fully protected." __Id.__ at § 1. The 1971 statute redefined what constitutes child abuse, __id.__ at § 2, and how to report such child abuse, __id.__ at § 3. The law directed the agency (then known as the Bureau of Children's Services) to administer the act. __Id.__ at §§ 4, 5 & 8.

The hearsay exception at issue in this case was enacted in 1974 and codified at __N.J.S.A.__ 9:6-8.46(a)(4). The Legislature approved this measure through __L.__ 1974, __c.__ 119, § 26, which passed on October 10, 1974. Notably, the preface to that

chapter reads: "An act concerning the manner of disposition of cases of child abuse or neglect, revising parts of the statutory law and providing for an appropriation." L. 1974, c. 119. Chapter 119 contains fifty-six sections, all of which created or modified portions of Title 9.

Chapter 119 addressed many procedural aspects associated with abuse or neglect litigation, including the issuing of summonses in abuse-or-neglect cases, id. at § 17 (N.J.S.A. 9:6-8.37); sustaining or dismissing an abuse or neglect case, id. at § 30 (N.J.S.A. 9:6-8.50); and identifying who may originate an abuse-or-neglect proceeding, id. at § 14 (N.J.S.A. 9:6-8.34). Chapter 119 made no reference whatsoever to Title 30 guardianship proceedings.

Over the years, when overhauling or modifying provisions within Title 9 or Title 30, the Legislature has frequently (albeit not exclusively) dealt with those Titles separately. For example, in 1962, lawmakers reorganized many State agencies to fit under the administrative umbrella of the Division of Welfare, and outlined what functions the Bureau of Children's Services would administer. L. 1962, c. 197. Title 9 was only mentioned in that 1962 law incidentally, indicating how a finding of abuse or neglect would impact the State's ability to

file a complaint for termination of a parent's rights under Title 30. Id. at § 15.

Similarly, when the Legislature redefined child abuse standards in Title 9, L. 1987, c. 341, and passed the Comprehensive Child Abuse Prevention and Treatment Act, L. 1997, c. 175, it did so with scant or minimal reference to Title 30. When the four-prong "best interests" standard for termination was codified in L. 1991, c. 275, the provision was codified only in Title 30, with no cross-reference to Title 9.

We are mindful that, more recently since 1999, changes in our child welfare laws have tended to involve simultaneous revisions of portions of both Title 9 and Title 30. See, e.g., L. 1999, c. 53; L. 2004, c. 130; L. 2012, c. 16. Notably, however, when the Legislature amended N.J.S.A. 9:6-8.46(a) in 2005 by L. 2005, c. 269, § 2, to expand that evidentiary provision's applicability to administrative hearings in which a parent or other caretaker can be charged with abuse or neglect, the Legislature did nothing to expand the scope of those exceptions to Title 30 termination proceedings. Instead, the Legislature confined the 2005 expansion solely to administrative hearings.

As we have already highlighted, <u>N.J.S.A.</u> 9:6-8.46(a) specifies that it applies only to "any hearing under <u>this act</u>." (Emphasis added). The hearings provided under the 1974 law include a hearing upon emergency removal of a child, <u>L.</u> 1974, <u>c.</u> 119, § 11 (codified at <u>N.J.S.A.</u> 9:6-8.31); a hearing upon application to return a child that has been temporarily removed, <u>L.</u> 1974, <u>c.</u> 119, § 12 (codified at <u>N.J.S.A.</u> 9:6-8.32); a fact-finding hearing to determine whether a child was abused or neglected, <u>L.</u> 1974, <u>c.</u> 119, §§ 24, 26 (codified at <u>N.J.S.A.</u> 9:6-8.44, -8.46); and a dispositional hearing after which a court may release the child to the custody of his parents, relative, or other Division-approved caretaker, issue protective orders, and order therapeutic services, <u>L.</u> 1974, <u>c.</u> 119, §§ 25, 31 (codified at <u>N.J.S.A.</u> 9:6-8.45, -8.51).

The stated legislative objectives of <u>L.</u> 1974, <u>c.</u> 119, reflect that the law was intended to address abuse or neglect by providing for the emergency or temporary removal of children. <u>Senate Law, Public Safety & Defense Comm. Statement to S. 1217</u> (May 2, 1974). The Committee Statement described the fact-finding and dispositional hearings provided under the law. Notably, the Committee Statement does not mention permanent removal of children or the termination of parental rights.

We further agree with defendant and amicus that it would be illogical to read N.J.S.A. 9:6-8.46(a) as being applicable to Title 30 guardianship proceedings, in light of the clause within the subsection specifically disallowing uncorroborated statements of abuse from being "sufficient to make a fact finding of abuse or neglect."  N.J.S.A. 9:6-8.46(a)(1) (emphasis added).  If, as respondents maintain, the hearsay exception in the subsection generally extended to termination proceedings under Title 30, the language in subsection (a)(1) would seemingly allow uncorroborated statements to be used to establish that termination is in the best interests of a child pursuant to N.J.S.A. 30:4C-15.1(a), while prohibiting the use of such uncorroborated statements to establish abuse or neglect in a Title 9 proceeding.  Such an illogical construction should not be countenanced.  See State v. Morrison, 227 N.J. 295, 308 (2016) (instructing that a statute must be construed sensibly, and rejecting an interpretation "that leads to an absurd result [that] is distinctly at odds with the public-policy objectives of a statutory scheme").

D.

Apart from their unpersuasive textual and structural arguments, respondents point to passages within a few prior cases that they contend support, at least by inference, its

expansive interpretation of the hearsay exception in N.J.S.A. 9:6-8.46(a)(4).  For instance, respondents rely on Guardianship of D.M.H., 309 N.J. Super. 179, 202 (App. Div. 1998), in support of their claim that "it has been specifically held that Titles 9 and 30 should be read in pari materia."  However, our decision in D.M.H. was reversed by the Supreme Court.  See In re Guardianship of D.M.H., 161 N.J. 365, 394 (1999).  Respondents rely on one sentence that was dicta in our decision in D.M.H., which cited in turn the Supreme Court's decision in In re Adoption of a Child by D.M.H., 135 N.J. 473, 481, cert. denied sub nom, Hollingshead v. Hoxworth, 513 U.S. 967, 115 S. Ct. 433, 130 L. Ed. 2d 345 (1994).

In Adoption by D.M.H., the Supreme Court discussed the standards for terminating parental rights under the private adoption statutes, N.J.S.A. 9:3-48(c)(1) and N.J.S.A. 9:3-46(a).  Ibid.  Citing In re Adoption of Children by L.A.S., 134 N.J. 127, 134-35 (1993), the Court commented that the concept of "'[a]bandonment' in both private and public adoptions requires a state of mind that indicates the willful or purposeful repudiation of parental responsibilities."  Adoption by D.M.H., supra, 135 N.J. at 481.

In its earlier opinion in L.A.S., supra, the Court, again in dicta, compared the standards for terminating parental rights

in Title 30 with the standards in the Title 9 private adoption statutes and observed that "despite the differences in the respective statutory descriptions of the conditions required to terminate parental rights, the substantive standards governing both public and private termination proceedings are roughly equivalent to one another." 134 N.J. at 134 (emphasis added).

Notwithstanding this substantive overlap, the Supreme Court did not hold in Adoption by D.M.H., nor in L.A.S., that Title 9 and Title 30 must be read, for all purposes, in pari materia. Indeed, no reported case has made such a sweeping, all-inclusive determination.

The Division further relies on New Jersey Division of Youth and Family Services v. F.H., 389 N.J. Super. 576, 609 (App. Div.), certif. denied, 192 N.J. 68 (2007), in support of its argument that N.J.S.A. 9:6-8.46 has been repeatedly applied in Title 30 guardianship trials. In F.H., this court considered whether the Division had proven by clear and convincing evidence in a Title 30 case that the parental rights of F.H. and A.H. as to their three children should be terminated. Id. at 584. We held that the record supported a conclusion that the parents had harmed the middle child but not the other two children. Id. at 612-13. As a passing observation, we "recognize[d], however, that under N.J.S.A. 9:6-8.46[(a)(1)], 'proof of the abuse or

neglect of one child shall be admissible evidence on the issue of the abuse or neglect of any other child of . . . the parent[.]'" Id. at 613.

We did not analyze in F.H. whether Title 9's special evidence provisions had been appropriately applied in a Title 30 guardianship case. Indeed, after citing the Title 9 evidence statute, we went on to say that "as a part of its burden of proof, the State must still demonstrate by a preponderance of the competent, material and relevant evidence (N.J.S.A. 9:6-8.46(b)) the probability of present or future harm." Id. at 614 (quoting N.J. Div. of Youth & Family Servs. v. S.S., 372 N.J. Super. 13, 24 (App. Div. 2004), certif. denied, 182 N.J. 426 (2005)).

Viewed in proper context, our focus in F.H. was to emphasize that the burden of proof must be satisfied, regardless of the admission of evidence concerning abuse of a sibling. Based on the facts in that record, we concluded that the Division had not proven the first prong of N.J.S.A. 30:4C-15.1(a) as to the middle child's two siblings. Id. at 616-17. We do not regard the passages in F.H. cited by the Division as authoritatively or conclusively establishing that N.J.S.A. 9:6-8.46(a)(4) is generally applicable to Title 30 termination

cases. Importantly, that specific legal question was not before the F.H. panel, as it now is here.

Further, although F.H. quoted from the Title 9 statute, there is case law independently suggesting that competent proof of the abuse or neglect of a sibling is admissible in considering harm to a child in a Title 30 proceeding. See J. v. M., 157 N.J. Super. 478, 493 (App. Div. 1978) (finding "[a]ll any court can rely upon in determining whether to sever parental rights is the parents' past course of conduct, whether to the child in question or to other children in their care"), certif. denied, 77 N.J. 490 (1978). Reliance on N.J.S.A. 9:6-8.46(a)(1) therefore was not necessary in F.H. for recognizing that appropriate evidence of abuse or neglect of a sibling may be admissible in a guardianship trial.

The Division also cites to New Jersey Division of Youth and Family Services v. A.R.G., 179 N.J. 264, 275-78 (2004), and New Jersey Division of Youth and Family Services v. N.S., 412 N.J. Super. 593, 624, 626-27 (App. Div. 2010), as indicative that our courts at times have given collateral estoppel effect to Title 9 findings in Title 30 cases where the findings were based on hearsay statements of abused children. In A.R.G., the Supreme Court specifically considered whether aggravated circumstances existed, such that the Division was excused under N.J.S.A.

30:4C-11.3(a) from providing reasonable efforts towards reunification. 179 N.J. at 270. The trial court had found by clear and convincing evidence that the child "had been subjected to aggravated circumstances of abuse and cruelty" based on photographs of the child's injuries, medical records, the caseworker's testimony, and the Division's report. Id. at 275.

On appeal to the Supreme Court in A.R.G., the defendant argued that he had been denied due process and that the evidence was insufficient to support the trial court's findings, in part, because the testimony of the caseworker relied on hearsay. Id. at 280. The Division countered that the testimony of the caseworker was admissible because it was based on her first-hand knowledge of the child's injuries, and because it accorded with N.J.S.A. 9:6-8.46(a)(4) and Rule 5:12-4(d).[11] Id. at 281. The Court did not address these arguments in its decision.

---

[11] Rule 5:12-4(d) provides that the Division may submit into evidence, pursuant to the general business record hearsay exception, N.J.R.E. 803(c)(6), and N.J.R.E. 801(d) (defining a "business" for purposes of the hearsay rules), "reports by [Division] staff personnel or professional consultants." That Court Rule, which is not at issue in this appeal, does not govern the analysis of the statutory provisions within Title 9 and Title 30, nor does it provide any insight into the Legislature's intent. In any event, hearsay statements from a child embedded in such reports would need an independent pathway for admission to be considered for their truth. See N.J.R.E. 805 (limiting the admissibility of hearsay within hearsay); see also N.J. Div. of Child Protection & Permanency v. N.T., 445 N.J. Super. 478, 497 (App. Div. 2016).

Instead, it focused on developing a standard that could be used to find "aggravated circumstances" under N.J.S.A. 30:4C-11.3. Id. at 282-85. After setting forth the standard to be used, it remanded the matter to the trial court for a de novo review of the issue of "aggravated circumstances." Id. at 285.

The Division suggests that the opinion in A.R.G. signifies that decisions made by a Title 9 court, on a finding of clear and convincing evidence that includes hearsay, can satisfy elements of the best interests test prescribed in N.J.S.A. 30:4C-15.1(a). However, the Supreme Court in A.R.G. did not so hold and did not even consider the question.

Yet another case relied on by the Division, N.S., supra, 412 N.J. Super. at 606, is likewise not dispositive. In N.S., the defendants challenged a finding of abuse and neglect rendered in a Title 9 proceeding. Despite the Division's claim that the trial court had admitted the hearsay statements of a child and found abuse by clear and convincing evidence, we recognized that the Division's assigned burden of proof in a Title 9 case was only by a preponderance of the evidence. Id. at 615. The question of the admissibility of hearsay was not before this court. Rather, the defendants had objected to the statements of the child on the basis that "they were the product

41                                                        A-2565-15T2

of highly suggestive and improper questioning techniques." Id. at 621 (internal quotations omitted).

The Division also has cited to us a handful of unreported opinions, in which various panels of this court have presumed or stated in passing that the special evidentiary provisions in N.J.S.A. 9:6-8.46(a)(4) apply in Title 30 termination trials. We place no reliance on those unpublished opinions as authoritative. See R. 1:36-3. According to the Division, these unreported opinions are at least suggestive of a custom to treat Title 9 and Title 30 evidentiary principles interchangeably.

Nevertheless, regardless of such claims of custom, we are obligated to apply and enforce our statutes in accordance with their plain terms. Those plain terms, as we have shown, mandate that N.J.S.A. 9:6-8.46(a)(4) be confined to Title 9 proceedings rather than Title 30 guardianship trials.

E.

The Supreme Court has long noted important differences between Title 9 and 30 proceedings. As the Court observed in New Jersey Division of Youth and Family Services v. R.D.:

> Title Nine proceedings differ from Title Thirty proceedings in three fundamental respects: Title Nine proceedings are intended to be started and completed quickly, while Title Thirty proceedings stress a more deliberative and comprehensive approach; Title Nine proceedings are geared towards an interim form of relief — removal

of the child from immediate harm, with permanent placement to be considered at a later date — while the relief sought in Title Thirty proceedings is the permanent termination of parental rights that will allow the child to become eligible for adoption by another; and, most importantly, the differing standards of proof applicable to those disparate proceedings highlight a fundamental difference between the two.

[207 N.J. 88, 118 (2011).]

Although it did not directly address the discrete issue now before us, the Supreme Court's opinion in R.D. provides a specific indication that the special evidentiary provisions that apply in Title 9 proceedings are not impliedly applicable in Title 30 proceedings. Id. at 114. As the Court observed, there are differences between those proceedings "in respect of the standards for admissibility of evidence." Ibid. The Court went on to cite the subsections within N.J.S.A. 9:6-8.46 as exemplifying those differences. Although the Court used the adjective "minor" to describe those differences, the instructive point for our present purposes is that the Court in R.D. acknowledged the existence of differences between the evidentiary provisions that apply in Title 9 proceedings and those that govern Title 30 termination proceedings. Ibid.

Moreover, there are markedly different burdens of proof respectively imposed by the Legislature for Title 30 termination proceedings, as opposed to abuse or neglect proceedings under

Title 9. The Division's burden of proof in Title 9 abuse or neglect cases, whether litigated in the Family Part under the FN docket or in administrative proceedings, is the mere preponderance of the evidence. Id. at 96. By contrast, the Division bears a much heavier burden of proof in guardianship trials when seeking the termination of a parent's rights, having the duty to establish all four statutory criteria by clear and convincing evidence. N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 103 (2008).

Because the termination of a parent's right to raise his or her child is permanent under the Title 30 statute, the Legislature had a logical basis to impose a more stringent burden on the Division in such termination cases. By comparison, a parent or guardian who is found in a Title 9 proceeding to have engaged in an act of abuse or neglect will not necessarily have their rights terminated, but will be placed on the Child Abuse Registry. N.J. Div. of Child Protection & Permanency v. V.E., 448 N.J. Super. 374, 391-92 (App. Div. 2017). Although that registry consequence is also a serious one, it does not equate to a parent's loss of a child forever. Accordingly, it was entirely logical for the Legislature to confine the special evidentiary rules in N.J.S.A. 9:6-8.46(a), which ease the Division's burden, to Title 9 cases, and to

require the Division to adduce more rigorous and persuasive proof in a <u>Title</u> 30 termination trial.

Of course, the Legislature has the prerogative to amend <u>Title</u> 30 and incorporate some or all of the special evidentiary exceptions from <u>Title</u> 9 into that statute, if it so chooses. The Legislature is best positioned to weigh the legitimate policy interests in shielding children from stressful court appearances against the likewise legitimate interests of defendants in assuring that their parental rights are not terminated in an unfair manner based upon unreliable hearsay. We leave that policy choice to our elected officials. It is not our task or role to provide an advisory opinion about the merits of such hypothetical legislation. <u>G.H. v. Twp. of Galloway</u>, 199 <u>N.J.</u> 135, 136 (2009).

Nor do we need to reach here the constitutional issues of due process posed by amicus. <u>See</u> <u>Randolph Twp. Ctr., L.P. v. Cnty. of Morris</u>, 186 <u>N.J.</u> 78, 80 (2006) (stating the well-known principle that courts "should not reach a constitutional question unless its resolution is imperative to the disposition of litigation").

F.

As an alternative legal basis for the admission of the minor females' hearsay allegations of sexual abuse, the Division

argues that, under N.J.R.E. 703, the trial court properly considered the substance of those allegations, insofar they were "facts or data" noted by Dr. Katz in his own expert testimony. We disagree.

N.J.R.E. 703 does allow a testifying expert to base his or her opinions on "facts or data" that are either "perceived by or made known to the expert at or before the hearing" or trial. Ibid. Rule 703 adds that if the facts or data are "of a type reasonably relied upon by experts in [the expert's] particular field in forming opinions or inferences upon the subject," such information "need not be admissible in evidence." Ibid.; see, e.g., In re Civil Commitment of J.M.H., 367 N.J. Super. 599, 612 (App. Div. 2003), certif. denied, 179 N.J. 312 (2004).

An important limitation of this Rule 703 exception is that, if the "facts or data" relied upon by the expert are not admissible, then the court or trier of fact may only consider those facts or data to the extent it is helpful in understanding the expert's opinions or assessing their credibility. The non-admitted facts or data, which are often hearsay, may not be considered for their truth as substantive proof. See, e.g., Agha v. Feiner, 198 N.J. 50, 63 (2009); McLean v. Liberty Health Sys., 430 N.J. Super. 156, 173-74 (App. Div. 2013).

The expert's testimony may not be used as a "conduit" to establish facts that are not independently supported by competent evidence. Agha, supra, 198 N.J. at 63; James v. Ruiz, 440 N.J. Super. 45, 66 (App. Div. 2015). If an expert opinion is based on a fact not in evidence, "its persuasiveness is greatly undermined." Goyden v. State Judiciary, 256 N.J. Super. 438, 455 (App. Div. 1991), aff'd o.b., 128 N.J. 54 (1992).

Indeed, we have admonished the Division and trial judges in several reported cases to refrain from basing determinations in child welfare cases upon inadmissible hearsay or other incompetent proof. See, e.g., N.J. Div. of Child Protection & Permanency v. S.G., 448 N.J. Super. 135, 146-47 (App. Div. 2016) (vacating the finding of abuse-or-neglect because the trial court relied entirely on Division reports to establish the defendant's marijuana use and should have instead heard some witness testimony); N.T., supra, 445 N.J. Super. at 501 (disallowing the hearsay opinion of a psychologist about a complex diagnosis of a child's PTSD, where the diagnosis was not shown to be trustworthy); N.J. Div. of Youth & Family Servs. v. B.M., 413 N.J. Super. 118, 128 (App. Div. 2010) (disallowing reliance on information from a hearsay source about a child's fetal alcohol syndrome in a Title 30 termination proceeding).

Here, Dr. Katz had no personal knowledge of the truth of the girls' sexual abuse allegations. As we have noted, Jenny and Sandy did not testify at the guardianship trial. Nor did Dr. Katz cite to any objective or clinical evidence to corroborate the abuse. In fact, at least at one point, Jenny recanted her allegations. Moreover, as Dr. Katz himself noted, there were inconsistencies within the hearsay allegations.

For these many reasons, we conclude it was error for the trial court to admit and rely on those inadmissible hearsay allegations of sexual abuse in this case.[12] We do, however, offer one important caveat to that conclusion, as it relates to Sandy's specific allegations relative to defendant's involvement in her abortion.

As we noted in our factual recitation in Part I, supra, the Division moved into evidence a certified copy of Sandy's medical records from her abortion procedure. Despite defense counsel's strenuous objection to other hearsay items of proof, defendant did not oppose the admission of the medical records. Those

---

[12] We note there is no contention by the Division that the girls' allegations were admissible under the "tender years" hearsay exception, N.J.R.E. 803(c)(27), which requires, among other things, a judicial finding of trustworthiness after certain special procedures and a Rule 104 hearing are followed. State v. P.S., 202 N.J. 237, 249 (2010). Moreover, Sandy was over the age of twelve and thus not of "tender years" within the terms of that provision.

records do not establish that defendant had sexual relations with Sandy, who apparently told the medical staff that she had been impregnated by her boyfriend.

In any event, the medical records are probative and competent evidence of certain facts, i.e., that defendant took Sandy to the office, that he purported to authorize the procedure as her parent or guardian, and that the procedure was an abortion. Such evidence is particularly relevant to rebut defendant's claims to the contrary. It was also underscored in Dr. Katz's trial testimony as inappropriate behavior indicative of defendant's unsuitability as a parent. To that limited extent, the trial court was entitled to consider the unchallenged medical records concerning the abortion and the expert's associated testimony. Any claim of error in this regard by defendant is rejected as invited or waived. See N.J. Div. of Youth & Family Servs. v. M.C., III, 201 N.J. 328, 339–42 (2010). There is no fundamental injustice in upholding the limited use of those particular records.

## III.

Having concluded that the trial court erred in admitting the portions of the trial exhibits and testimony relating to Jenny's and Sandy's hearsay allegations of defendant's sexual wrongdoing, we must now consider the impact of that mistake.

A-2565-15T2

Specifically, we must evaluate whether the error was, as respondents argue, merely harmless, see State v. Macon, 57 N.J. 325, 340 (1971), or whether it was sufficiently prejudicial to have been "clearly capable of producing an unjust result." R. 2:10-2.

Defendant's long-standing failure to comply with court orders and services provided by the Division and to maintain a relationship with Calvin despite supervised visitation offered to him reflect serious deficiencies on his part. Even so, we have concerns about the extent that the hearsay allegations of sexual abuse affected the trial court's overall analysis of this case with respect to prongs one, two, and four. As the trial judge explicitly stated in her written decision, the court could "not ignore" the minors' allegations. The judge accepted at face value their reported hearsay contentions that defendant had engaged in a "consistent pattern of egregious acts of abuse or neglect."

If what the minors had alleged about defendant's utterly deplorable sexual conduct is indeed true, the judge's comments are surely justified. Such outrageous conduct, if proven, warrants severe sanctions and the utmost protection against its reoccurrence. Yet, despite the severity of the allegations of sexual wrongdoing, the State did not criminally prosecute

defendant, perhaps because of the recantation and the inconsistencies within the girls' narratives. Moreover, the Division chose not to attempt to prove the sexual abuse allegations at a <u>Title</u> 9 fact-finding hearing, despite having initially filed a complaint against defendant under <u>Title</u> 9.

The fundamental problem for our present appellate review is that the girls' allegations of abuse were not supported by any competent proof in this record under the evidentiary rules that govern <u>Title</u> 30 proceedings. Indeed, much of Dr. Katz's opinion was predicated on an assumption that "if" the girls' allegations were true, then certain inferences and protective measures were warranted. Consequently, the unproven allegations of sexual abuse must be disregarded.

Our concerns about such spillover effects do not extend to the trial judge's findings with respect to prong three of the statute. The record abundantly supports the judge's determination that the Division made reasonable efforts to provide services to defendant and Calvin. Defendant simply failed to take advantage of those services. Although we are mindful that the sexual therapy offered to him might be inappropriate <u>if</u> the minors' hearsay allegations of sexual abuse are untrue, that is no excuse for defendant's failures to comply with other services such as parenting classes and visitation.

51                                                    A-2565-15T2

Moreover, the Division reasonably ruled out T.C. as an alternative caretaker in light of her own deficiencies, and, as the trial judge found, no suitable relatives of Calvin were identified.[13]

Given these considerations, we conclude that a remand to the trial judge is appropriate to afford the judge an opportunity to reconsider her ruling in light of the guidance provided in this opinion. Specifically, the judge should determine whether, _if_ the hearsay allegations of sexual abuse are disregarded, she would still conclude that the Division met its burden of proving statutory prongs one, two, and four by clear and convincing evidence. We anticipate that the judge is perfectly capable of objectively making that assessment. Despite having literally said (perhaps as a figure of speech) that she could not "ignore" the allegations, we are respectfully now asking her to do so. In remanding for that purpose, we bear in mind the judge's unique perspective as the fact-finder who presided over this marathon ten-day trial that spanned nearly a

---

[13] In this record, we detect no abuse of discretion or prejudicial error by the trial judge in disallowing testimony by T.C. in defendant's case, since, as we have noted, the Division presented no competent proof that sexual abuse actually occurred in T.C.'s residence. However, on remand, the court shall have the discretion to reconsider allowing testimony from T.C. on other subjects, including the current status of her household.

whole year.   We discern no compelling reason to remand this matter to another judge.

On remand, the trial judge shall have the discretion to permit updated or other additional relevant proofs from the parties, including updated expert opinions.   Such discretion, however, shall be exercised subject to the condition that the Division may not attempt to re-prove the truth of the girls' hearsay allegations by other means.   It would be fundamentally unfair to defendant to allow the Division a second opportunity to prove in a reopened proceeding what it failed to prove by competent evidence at the original trial.   The trial court shall conduct a case management conference within thirty days of this opinion to plan with counsel the remand proceedings.

All other points raised by defendant lack sufficient merit to warrant discussion.   R. 2:11-3(e)(1)(E).

Affirmed as to the trial court's findings under prong three of N.J.S.A. 30:4C-15.1(a); vacated and remanded as to prongs one, two, and four.   We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION