# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4892-15T2

NEW JERSEY DIVISION OF CHILD
PROTECTION AND PERMANENCY,

    Plaintiff-Respondent,

v.

N.M.,

    Defendant-Appellant,

and

J.W.,

    Defendant.

_____

IN THE MATTER OF THE GUARDIANSHIP
OF A.W., P.W. and M.W.,

    Minors.

_____

Submitted September 25, 2018 – Decided  October 22, 2018

Before Judges Yannotti and Natali.

On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Passaic County, Docket No. FG-16-0065-16.

Joseph E. Krakora, Public Defender, attorney for appellant (Patricia A. Nichols, Assistant Deputy Public Defender, of counsel and on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Jason W. Rockwell, Assistant Attorney General, of counsel; Julie B. Colonna, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors (Todd S. Wilson, Designated Counsel, on the brief).

PER CURIAM

N.M. (Natalie) appeals from a June 28, 2016 Family Part order terminating her parental rights to her three minor daughters, A.D.W. (Amy), P.S.W. (Paula), and M.S.W. (Michelle).[1] The children's father, J.W. (Joe), has not appealed from the termination of his parental rights.

Natalie argues that plaintiff Division of Child Protection and Permanency (Division) failed to prove all four prongs of the "best interests of the child" test under N.J.S.A. 30:4C-15.1(a) by clear and convincing evidence. Natalie also argues that the trial court committed error by admitting and

---

[1] We use fictitious names for N.M., J.W., A.D.W., P.S.W., and M.S.W. to protect their privacy and for ease of reference.

considering hearsay allegations of sexual abuse against Joe in terminating her parental rights.  Finally, Natalie contends that her due process rights were violated and she was denied a fair hearing based upon the court's improper evidentiary rulings and the ineffective assistance of her trial counsel.  Having considered these arguments in light of the record and applicable legal principles, we affirm.

## I.

Natalie and Joe have three daughters together, Amy, Paula, and Michelle.  Amy, the eldest, was born in St. Joseph's Hospital in early July 2009.  The next day, St. Joseph's made a referral to the Division reporting that Natalie acted erratically after Amy's birth and stated she did not have sufficient supplies for the newborn.  The Division investigated the allegations and determined they were unfounded but opened a case for Natalie, who acknowledged a history of heroin use, to provide her with services.  Natalie also informed hospital staff that she was not taking any medication for her bipolar disorder.

Natalie's second daughter, Paula, was born in late December 2010.  For the next three and one-half years, Natalie, Amy and Paula lived in hotels and a

series of shelters for homeless women.  A number of the shelters discharged Natalie because she failed to comply with their rules.

At one shelter, Natalie was cited for inadequately supervising her children, failing to obey curfew, and for talking with a male believed to be Joe. At another, she was discharged for failing to pay her monthly dues and because of her acrimonious relationship with other residents.  At two other shelters, she was discharged because she improperly permitted Joe on the property.  Natalie admitted she briefly relapsed on heroin while at one of the shelters.

On May 28, 2014, in part because Natalie had no plans for the children after her removal from the last shelter, the Division executed a Dodd[2] removal of Amy and Paula and placed them in a resource home.  On May 30, 2014, after the Division filed a verified complaint and order to show, the court awarded custody of Amy and Paula to the Division.

Natalie's youngest child, Michelle, was born in June 2014.  One month before Michelle was born, Natalie admitted to taking opiates from a friend to deal with stress.  The Division executed a second Dodd removal for Michelle

---

[2]  A "Dodd removal" refers to the emergency removal of a child from a home without a court order as authorized by N.J.S.A. 9:6-8.29 of the Dodd Act, N.J.S.A. 9:6-8.21 to -8.82.

on June 16, 2014, after a social worker from St. Joseph's Hospital informed the Division that Natalie had given birth. Michelle was placed with Amy and Paula in their resource home shortly after the removal.

Prior to the Dodd removals, Natalie Diaz (Diaz), a Division permanency worker, offered Natalie assistance with housing and shelter, recommended drug abuse treatment, and tried to get her into a Mommy and Me program. After the Dodd removals, Diaz made extensive efforts to secure housing for Natalie and the children, and to address Natalie's substance abuse issues. Among other efforts, Diaz called several shelters, referred Natalie for a substance abuse evaluation, arranged a psychological evaluation, and recommended her to domestic violence counseling at a women's center.

In June 2014, Dr. Robert Kanen conducted a psychological evaluation of Natalie. He reported a history of mental health issues and unstable housing. Dr. Kanen recommended Natalie attend long-term inpatient drug treatment, a psychiatric evaluation, individual psychotherapy, and parenting skills classes, and suggested that she obtain stable housing.

In August 2014, Dr. Alvaro Gutierrez conducted a psychiatric evaluation of Natalie. Dr. Gutierrez also recommended in-patient drug treatment, psychotherapy, and medication for her mental health issues.

During the Division's involvement, Natalie repeatedly failed to complete her substance abuse treatment. For example, after Diaz referred Natalie to an inpatient program at Straight and Narrow for a higher level of substance abuse treatment, Natalie was discharged on October 10, 2014 for rule violations. Natalie was re-admitted but did not successfully complete the program.

In the spring of 2015, the Division received a referral from the girls' play therapist reporting that Paula disclosed Joe had sexually abused her. The Division investigated and substantiated the sexual abuse allegation. During the investigation, the Division had Paula, Amy, and Natalie evaluated at the Audrey Hepburn Children's House (AHCH).

Dr. Anthony D'Urso, the supervising psychologist at AHCH, reviewed, completed, and approved their evaluation reports. At trial, Dr. D'Urso testified that Amy disclosed she also was abused by Joe and that she witnessed the abuse of her sister Paula. Dr. D'Urso further testified that although his team of professionals does not act in a fact-finding role, the allegations of abuse were clinically supported, so AHCH referred the allegations to the Division.

The Division informed the prosecutor's office of the allegations but no criminal charges were filed against Joe. However, on March 6, 2015, the trial

court entered an emergent order suspending Joe's visitation. Natalie's visitation continued after she completed a parenting evaluation.

Natalie did not believe the children's sexual abuse disclosures nor did she alter her relationship with Joe. Dr. D'Urso testified that Amy said Natalie was present when the abuse of Paula occurred, and Diaz testified to a phone conversation with the girls in which they disclosed that Natalie had told them to tell Diaz the sexual abuse never happened.

In July 2015, Diaz referred Natalie for an updated substance abuse evaluation, which Natalie completed. Natalie went to Bergen Regional Medical Center for treatment, but she was discharged two weeks later without successfully completing the program.

In December 2015, the Division assigned the case to adoption worker Francesca Giordano (Giordano) and, around that time, referred Natalie and the children to therapeutic supervised visitation. Beginning in January 2016, Scott Nelson (Nelson), a licensed professional counselor, supervised the visitations.

Around April 2016, the Division referred Natalie and the children to Dr. Mark Singer, a licensed psychologist, for psychological and bonding evaluations. Dr. Singer found Natalie was not a viable parenting option for the children because of her lack of stable housing, her substance abuse problems

and long history of non-compliance with services. Dr. Singer also stated that whether or not the sexual abuse allegations against Joe were true, Natalie lacked empathy and the skills to respond appropriately to the children's needs and the reasons why the children would make the statements. Dr. Singer also performed bonding evaluations of the children and their resource parents.

In May 2016, the court conducted a three-day trial on the Division's guardianship complaint. At trial, the Division relied on documentary evidence and the testimony of Diaz, Giordano, and three expert witnesses: Dr. Singer, who was qualified as an expert in psychology, parenting and bonding; Nelson, who qualified as an expert in family counseling; and Dr. D'Urso, who was qualified as an expert in psychology and child sexual abuse. Neither parent testified, and Natalie offered only one item of evidence. The Law Guardian presented no witnesses.

In a detailed thirty-four page written decision, Judge Daniel J. Yablonsky found the Division proved by clear and convincing evidence all four prongs of N.J.S.A. 30:4C-15.1(a). The judge entered a judgment terminating Natalie's and Joe's parental rights to Amy, Paula, and Michelle and awarded the Division guardianship of the children. Natalie's appeal followed.

## II.

On appeal, Natalie argues that the Division failed to satisfy its burden under the statutory "best interests of the child" test and that the trial court failed to make appropriate factual findings in accordance with Rule 1:7-4. Natalie next argues that the trial court improperly admitted and considered the sexual allegations against Joe. Natalie also claims she was denied due process and a fair proceeding based on the following grounds: 1) the trial court allowed plaintiff's main fact-witnesses to have their recollections refreshed improperly with materials not admitted in evidence; 2) documents "riddled with inadmissible hearsay" were improperly admitted into evidence; and 3) she was denied effective assistance of trial counsel because counsel failed to provide her with "faithful and robust representation," and instead abandoned "any notion of partisan representation."

We disagree with each of Natalie's arguments and affirm substantially for the reasons set forth by Judge Yablonsky in his well-reasoned and thoughtful written opinion. We address the best interest test in section III, Natalie's argument regarding the trial court's admission and consideration of the sexual abuse allegations against Joe in section IV, her additional

evidentiary arguments in section V, and her ineffective assistance of counsel claim in section VI.

III.

As to Natalie's first point, because all of the trial judge's findings were supported by evidence the judge found to be clear, convincing, and credible, they are entitled to our deference. N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 448-49 (2012); Cesare v. Cesare, 154 N.J. 394, 413 (1998).

Parents have a constitutionally protected right to the care, custody and control of their children. Santosky v. Kramer, 455 U.S. 745, 753 (1982); In re Guardianship of K.H.O., 161 N.J. 337, 346 (1999). The right to have a parental relationship, however, is not absolute. N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 553 (2014); N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 599 (1986). At times, a parent's interest must yield to the State's obligation to protect children from harm. N.J. Div. of Youth & Family Servs. v. G.M., 198 N.J. 382, 397 (2009); In re Guardianship of J.C., 129 N.J. 1, 10 (1992). To effectuate these concerns, the Legislature codified the test for determining when a parent's rights must be terminated in a child's best interests. N.J.S.A. 30:4C-15.1(a) requires that the Division prove by clear and convincing evidence the following four prongs:

(1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;

(2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;

(3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

See also A.W., 103 N.J. at 604-11.

A.    Prong One

As to the first prong, the judge concluded that Natalie's "lack of stable housing" and her lack of parenting capabilities endangered the children's safety and development. Specifically, the trial court found that Natalie "was unable to provide a home for her children due to her ongoing substance abuse and failure to comply with multiple programs offered by the Division." The record amply supports these conclusions.

11                                                      A-4892-15T2

Diaz testified that the Division first became involved with Amy in July 2009, after Amy's birth when Natalie admitted to a history of heroin use. From 2010 through 2014, Natalie and Amy and Paula lived in a series of shelters for homeless mothers and their children. While Natalie did well in her inpatient substance abuse program, nothing in the record suggests that she would be able to maintain sobriety outside a controlled environment. Due to Natalie's persistent substance abuse and failure to respond appropriately to the allegations of sexual abuse, the children were removed and could not be returned to her care. Thus, the children were harmed by the withdrawal of Natalie's "solicitude, nurture and care for an extended period of time," which "is in itself a harm that endangers the health and development of the child." See In re Guardianship of D.M.H., 161 N.J. 365, 379 (1999).

B.    Prong Two

As is often the case, the findings regarding the first prong inform and are relevant to the second prong. See N.J. Div. of Youth & Family Servs. v. R.L., 388 N.J. Super. 81, 88 (App. Div. 2006). The judge again observed that Natalie's "past history of treatment with numerous relapses and failed attempts shed doubt on her ability to eliminate the harm" and she "never demonstrated a commitment to sobriety while living on her own . . . ." Based on the trial

testimony, the court concluded that Natalie's "history of substance abuse and [lack of] stable housing . . . pose an enormous risk to the young children . . . ." There was substantial credible evidence to support this finding. For example, Dr. Singer testified that, based in part on Natalie's multiple failed attempts to maintain sobriety outside of a controlled environment, she was not a viable parenting option and it was unlikely she would be able to mitigate the harm facing the children.

C.   Prong Three

The judge also found that the Division offered assistance to help Natalie correct the circumstances which led to the children's removal. The Division provided Natalie with innumerable services including substance abuse treatment, psychological and bonding evaluations, transportation, housing referrals and assistance, parenting skills classes and supervised visitation. Natalie failed to comply with many of these services or was discharged for failing to comply with program rules. In light of these facts, we agree with the trial judge that the Division's efforts were reasonable.

The Division also considered alternatives to termination of parental rights. The Division considered and rejected various relatives recommended by Natalie and Joe, including Joe's sister, mother and father, and Natalie's

13

sister and brothers. Further, because the resource parents were willing to adopt all three children, kinship legal guardianship was not appropriate as adoption was both feasible and likely.

D.   Prong Four

In considering the fourth prong, the trial judge relied on Dr. Singer's unrebutted expert opinion and concluded that termination of parental rights would not do more harm than good. Dr. Singer testified that the children have bonded with their resource parents and consider them their psychological parents. As stated previously, the resource parents are willing to adopt all three children and provide them with a permanent home.

Dr. Singer also testified that if separated from the resource parents, the children would suffer a significant loss. Natalie cannot provide the children with the permanency they need nor will she be able to mitigate the loss the children will endure if separated from their resource parents. In sum, the trial judge's findings establish that termination of Natalie's parental rights will not do more harm than good.

IV.

Relying on New Jersey Division of Child Protection & Permanency v. T.U.B., 450 N.J. Super. 210 (App. Div. 2017), Natalie contends, for the first

14

time on appeal, that the trial judge committed reversible error by admitting uncorroborated, hearsay allegations of sexual abuse of Amy and Paula by Joe. We disagree. T.U.B. is factually distinguishable and since the evidence unrelated to Joe's sexual abuse that clearly and convincingly established that termination of Natalie's parental rights was in the children's best interest, we conclude any error was harmless.

We apply the plain error standard here because Natalie did not object at trial. R. 2:10–2. "Under that standard, '[a] reviewing court may reverse on the basis of unchallenged error only if it finds plain error clearly capable of producing an unjust result.'" State v. Bunch, 180 N.J. 534, 541 (2004) (quoting State v. Afanador, 151 N.J. 41, 54 (1997)).

In T.U.B., we concluded it was error for the trial court to admit and rely on inadmissible hearsay allegations of sexual abuse in a Title 30 proceeding based upon a hearsay exception applicable solely to Title 9 matters. In that case, the defendant denied engaging in sexual abuse and was not criminally charged. T.U.B., 450 N.J. Super. at 216. The alleged victims did not testify, and none of the testifying witnesses had any personal knowledge regarding the truth of the children's sexual abuse allegations. Id. at 215. The trial court admitted the hearsay statements pursuant to a statutory provision codified at N.J.S.A. 9:6-

8.46(a)(4), which permits the admission of certain statements of minors in Title 9 abuse or neglect proceedings, reasoning that Title 9 and Title 30 should be "construed together as a unitary and harmonious whole." Id. at 222. We reversed and concluded that N.J.S.A. 9:6-8.46(a)(4) was inapplicable in Title 30 guardianship cases. Id. at 244-45.

Unlike in T.U.B., Natalie did not object to the admission of the sexual abuse testimony. Moreover, the Division substantiated that Joe, not Natalie, sexually abused the girls. As to Natalie, the court based its decision terminating her parental rights substantially on evidence unrelated to those allegations.

Further, the sexual abuse evidence was properly admitted for non-hearsay purposes to show how the Division and Natalie reacted upon learning of the allegations. N.J.R.E. 801(c); State v. Long, 173 N.J. 138, 152 (2002) ("if evidence is not offered for the truth of the matter asserted, the evidence is not hearsay and no exception to the hearsay rule is necessary to introduce that evidence at trial.") For example, Diaz testified that after she learned about the allegations she referred Paula and Amy to AHCH for evaluations. Diaz and Giordano testified that Natalie did not alter her relationship with Joe after learning of the allegations and Nelson stated Natalie minimized or failed to

A-4892-15T2

acknowledge the children's sexual abuse concerns.  Singer similarly referred to the allegations in connection with Natalie's reaction to them, specifically, that she lacked empathy.

Thus, the evidence was probative not to prove that the abuse allegations were true, but to show the Division's response and the services it provided and further to demonstrate Natalie's lack of empathy, dismissiveness, and poor judgment, which reflected negatively on her ability to effectively parent her children.

Finally, even assuming the admission of the sexual abuse testimony was a mistaken exercise of the court's discretion, any error was not clearly capable of producing an unjust result.  As we have concluded, there is considerable evidence in the record to support the judge's findings on the four prongs of the best interests of the child standard, including Natalie's failure to provide stable housing for her children despite extensive assistance by the Division, her inability to address her substance abuse issues in a non-controlled setting, and her failure to comply with services.

V.

We also reject Natalie's claim that the trial court committed reversible error by permitting Diaz and Giordano to refer to documents and notes

A-4892-15T2

prepared in anticipation of their trial testimony. Natalie argues it was improper to permit the witnesses to rely upon notes or documents without requiring the Division to first lay a foundation that their recollections needed to be refreshed as required by N.J.R.E. 612.

A court's evidentiary rulings are "entitled to deference absent a showing of an abuse of discretion, i.e., there has been a clear error of judgment." State v. Marrero, 148 N.J. 469, 484 (1997). On appellate review, a trial court's evidentiary ruling must be upheld "unless it can be shown that the trial court palpably abused its discretion, that is, that its finding was so wide of the mark that a manifest denial of justice resulted." State v. Carter, 91 N.J. 86, 106 (1982).

When a witness's memory is impaired and a foundation has been laid, he or she may view a document to refresh memory. Carter, 91 N.J. at 122; N.J.R.E. 612. If the witness's memory has been refreshed after viewing the document, he or she may testify according to that refreshed recollection. State v. Williams, 226 N.J. Super. 94, 103 (App. Div. 1988). A trial court, in its discretion, may disallow use of a document to refresh a witness's recollection "where the danger of undue suggestion outweighs the probable value of the evidence." Carter, 91 N.J. at 123. If the threshold requirement of impaired

memory is not met, an appellate court reviews the use of a document to refresh a witness's recollection for plain error.  Williams, 226 N.J. Super. at 104.

Here, our review of the record reveals that the court permitted Diaz and Giordano to refer to documents or notes after the court or counsel established an appropriate foundation or the witnesses first informed the court and all parties that they were referring to the notes.  As to those instances when the court permitted Diaz and Giordano to refer to documents without a proper foundation, any error did not result in a "manifest denial of justice," see Carter, 91 N.J. at 106, because, as Natalie concedes, the contact sheets and case history were in evidence.  Further, the notes were made available to Natalie and her counsel who thoroughly cross-examined Diaz and Giordano.

Next, we reject Natalie's claim of error in the trial court's admission of the documentary evidence as either invited or waived.  See N.J. Div. of Youth & Family Servs. v. M.C., III, 201 N.J. 328, 339-42 (2010).  Further, any error was harmless as the vast majority of the documents to which she now objects were Division records admissible as business records pursuant to Rule 5:12-4(d) (permitting the Division "to submit into evidence, pursuant to N.J.R.E. 803(c)(6) and 801(d), reports by staff personnel or professional consultants").  Therefore, subject to removing any embedded and inadmissible hearsay, the

DCPP's case contact sheets and reports would have been admissible upon a foundational showing that they were made in the ordinary course of the DCPP's business, or by DCPP's consultants made in the ordinary course of their businesses.

Here, our review of the record reveals that many of the statements contained in the admitted contact sheets were made by Natalie and are clearly admissible under N.J.R.E. 803(b)(1).  As noted, Natalie failed to object.  Had she done so, the Division could have established the necessary foundation or addressed any specific claim of embedded hearsay.

VI.

Finally, Natalie claims her trial counsel was ineffective because he "failed to investigate or present a defense," insufficiently prepared for trial, and was "ignorant of the law" relating to the Division's "duty to provide reasonable efforts to reunify the family" and the admissibility of evidence.  We disagree.

In N.J. Div. of Youth & Family Servs. v. B.R., 192 N.J. 301, 305-07 (2007), our Supreme Court adopted the two-prong standard established in Strickland v. Washington, 466 U.S. 668 (1984), and State v. Fritz, 105 N.J. 42 (1987), for evaluating ineffective assistance of counsel claims in termination

of parental rights matters. A defendant alleging ineffective assistance of counsel must prove:

> (1) counsel's performance must be objectively deficient - <u>i.e.</u>, it must fall outside the broad range of professionally acceptable performance; and
>
> (2) counsel's deficient performance must prejudice the defense - i.e., there must be "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."
>
> [<u>B.R.</u>, 192 N.J. at 307 (quoting <u>Strickland</u>, 466 U.S. at 694).]

The record supports the conclusion that Natalie received zealous representation throughout the litigation and at trial. During trial, Natalie's counsel objected to the Division witnesses' testimony and evidence when appropriate. Furthermore, he cross-examined all of the Division's witnesses and his cross-examinations were not "de minimis" as claimed by Natalie. Rather, counsel's cross-examinations highlighted that Natalie had made significant progress in her substance abuse treatment program, that she had not tested positive for illicit drugs, her visitations with her children were going well, the Division did not refer her to all the services recommended, and that although the Division substantiated Joe for sexual abuse, Joe was not criminally charged. He also challenged Dr. D'Urso's and Dr. Singer's evaluation procedures, as well as the facts underlying their opinions.

Furthermore, trial counsel was not ineffective for failing to object to the admission of Amy's and Paula's disclosures. The evidence was admissible for non-hearsay purposes and any error was harmless. With respect to counsel's failure to object to the admission of the documentary evidence, as we noted, many of the Division's records would have been admissible as business records pursuant to Rule 5:12-4(d). Further, it is likely that trial counsel strategically failed to object to avoid facing the direct testimony of adverse witnesses. See Strickland, 466 U.S. at 690 (explaining that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable").

Finally, even assuming that trial counsel's failures satisfy the first prong under Strickland, Natalie fails to establish that any deficiency of counsel prejudiced her as there was overwhelming admissible evidence proving clearly and convincingly that termination of her parental rights to Amy, Paula and Michelle was in their best interest.

To the extent not addressed, defendant's remaining arguments lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4892-15T2