# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0543-18T2

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

J.T.B.,

     Defendant-Appellant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF J.M.R.B.,

     a Minor.

_____

     Submitted June 4, 2019 – Decided June 19, 2019

     Before Judges Rothstadt and Natali.

     On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Gloucester County, Docket No. FG-08-0032-18.

     Joseph E. Krakora, Public Defender, attorney for appellant (Robyn A. Veasey, Deputy Public Defender,

of counsel; Lauren Derasmo, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Melissa Dutton Schaffer, Assistant Attorney General, of counsel; Erica L. Sharp, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Meredith Alexis Pollock, Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendant J.T.B. (John)[1] appeals from the Family Part's September 18, 2018 Judgment of Guardianship terminating his parental rights to J.M.R.B. (Jessica), who was eight years old at the time of the guardianship trial. We affirm because we find substantial credible evidence in the record to support the judge's determination.

The facts as developed at trial are summarized here. Defendant is the biological father of Jessica, who was born in 2012. The Division of Child Protection and Permanency (Division) first became involved with Jessica's mother, D.M.D. (Denise), in September 2011 when she tested positive for

---

[1] To protect privacy interests and for ease of reading, we use initials and fictitious names for the parents and children. R. 1:38-3(d)(12).

cocaine at a prenatal visit. Denise tested negative for cocaine at Jessica's birth, and in June 2013, custody was returned to Denise and the case was closed.

The Division again became involved with Denise in October 2015, after she had been hospitalized three times in one week and tested positive for various drugs. At that point, P.T. (Pamela), Jessica's maternal great-aunt, was granted temporary custody of Jessica. On April 22, 2016, Denise passed away, and on May 2, 2016, John obtained custody of Jessica. Until then, Jessica had only resided with Denise and Pamela. The Division closed its case in June of 2016.

In July of 2016, the Division received a referral from V.R. (Vivian), John's partner, who stated that John and Jessica had moved into her home in May of that year. Vivian suspected that John was using cocaine and stated that he had committed acts of domestic violence against her and physically abused Jessica. John had left Vivian's home with Jessica the night before and the two were staying at a motel, which Division workers visited that day to speak to John about the allegations in the referral, which John denied. Later that evening, caseworkers and police officers returned to the motel and found Jessica asleep alone in a third-floor room. John stated that his cousin was in the room caring for Jessica, but officers did not see anyone else in the room and when asked, Jessica said that only John had been watching her that day.

A-0543-18T2

As a result of this incident, the Division implemented a safety protection plan (SPP). John identified his aunt and uncle, who agreed to act as supervisors. The caseworker explained that John needed to be "supervised within sight and sound at all times with [Jessica]" and that "at no time should [John] leave the home alone with [Jessica] or be alone with [Jessica]." Five days later, the Division learned that John and Jessica left the aunt and uncle's home. John's aunt suspected that they returned to Vivian's home. Intake workers arrived at Vivian's home later that evening and found John and Jessica there. John stated that he was not aware that he had to remain at his aunt and uncle's home until further notice from the Division. Due to the violation of the SPP, the Division conducted a Dodd removal of Jessica on July 20, 2016.[2] The court upheld the emergency removal and placed Jessica in Vivian's care and granted John supervised visitation. The court ordered John to obtain stable housing, complete substance abuse and parental capacity evaluations, and submit to random drug screens.

In the months that followed, John tested positive on numerous occasions for cocaine and alcohol and was never able to demonstrate a sustained period of

---

[2]  A Dodd removal is an emergent removal of a minor without a court order pursuant to the Dodd Act, N.J.S.A. 9:6-8.21 to -8.82.  N.J. Div. of Child Prot. & Permanency v. T.U.B., 450 N.J. Super. 210, 215 n.2 (App. Div. 2017).

A-0543-18T2

sobriety. John was also largely noncompliant with services that the Division offered. He missed several visitation dates with Jessica. His parental capacity evaluation was rescheduled six times due to his failure to appear for appointments, he failed to appear for ten substance abuse evaluations, and he never attended substance abuse treatment as ordered.

In January 2017, Jessica was removed from Vivian's care and ultimately placed with Pamela, based on John's request. In May 2017, John was warned that noncompliance with services would result in the Division's permanency plan recommendation to the court to change from reunification to adoption. The caseworker reminded John that Jessica had been in placement since July of 2016, there was only one month before the court hearing for permanency, and several services had still not been completed.

On July 31, 2017, John attended a parenting capacity evaluation performed by Dr. Meryl Udell. The doctor recommended parenting classes and substance abuse treatment for John, and that reunification not be considered until John demonstrated nine to twelve months of recovery.

On September 27, 2017, the court approved the Division's plan to terminate John's parental rights followed by kinship legal guardianship (KLG) or adoption. Although John completed the parental capacity evaluation, he

"continue[d] to test positive for cocaine and alcohol and has failed to complete court-ordered substance abuse re-evaluation/treatment and parenting education." He also lacked stable housing. On November 6, 2017, the Division filed its Complaint for Guardianship.

In June 2018, Dr. James Loving performed a psychological evaluation of John where John "flatly denied the allegations that ha[d] been made against him" and "disputed every one of the incriminating details that [Dr. Loving] ha[d] summarized from the records," including living apart from Jessica for long periods of time, Vivian's allegations that resulted in the SPP, and failing to visit with Jessica. John denied noncompliance with the Division's services except because of practical reasons, such as his work schedule and a recent car accident.[3] Dr. Loving found that John gave the Division "no choice but to err in the direction of safety" because he posed risks as a parent and after a year of the Division's involvement, he was "essentially at 'square one' in terms of embarking on services that could help him assess his problem areas and then address them." Dr. Loving concluded that John had a "dismal prognosis" for complying with

---

[3] Notably, John never substantiated his excuses with any documents such as police reports about the accident or medical reports about his injuries or treatment that prevented him from complying with services and visitation.

services in the future and was "not likely to provide a safe, stable home for [Jessica] in the foreseeable future."

Dr. Loving also performed bonding evaluations between Jessica and both John and Pamela. In his findings, he noted that Jessica had only lived under John's primary care for three months, while she had spent several lengthy periods with Pamela, who "has arguably been the most constant and recurring parent figure [Jessica] has known." Although Dr. Loving observed that Jessica had a strong attachment to both John and Pamela, he opined that if John's parental rights were terminated, it would "place [Jessica] at only mild or low risk for long-term emotional harm," as she "has spent the majority of her young lifetime outside the primary care of her father, so this outcome would not represent a significant or meaningful change to her." According to Dr. Loving, Pamela would be able to mitigate this low risk of emotional harm. However, if Jessica were removed from Pamela's care, the "move and associated loss and disruption would place her at a rather high risk for long-term emotional harm," especially considering the early loss of her mother. Dr. Loving's opinion was that John would not be able to mitigate this risk of harm.

At the 2018 guardianship trial, Diana Blocker, the assigned caseworker, and Dr. Loving testified for the Division. Blocker stated that John completed a

A-0543-18T2

substance abuse evaluation in August 2016, after several referrals and appointments, and completed two hair follicle tests, both of which were positive for cocaine. Blocker testified that John did not complete parenting classes, had not been able to demonstrate a sustained period of sobriety, and had demonstrated "[m]inimal compliance at best" with urine drug screens. John's compliance with Division-supervised visitation was "[s]poradic." As of that date, John had not adequately addressed the risk of harm that led to Jessica's removal or the Division's concerns regarding substance abuse or parenting. As to John's ability to care for Jessica, Blocker stated that

> right now, we just have no evidence that anything has changed. All the services that we've tried to provide have not been completed, so therefore we have no baseline to see what progress has been made at this point. [John] is inconsistent with his contact with J[essica], so we don't even have that to go on. And it's just we're not sure if any of the issues that led to her removal have been officially remedied at this point.

When asked whether it seemed like any of those issues would be remedied in the foreseeable future, Blocker stated that she "ha[d] no indication that they would be." Blocker contended that Jessica desired to remain with Pamela and feels safe in Pamela's home. Additionally, "as long as they know that [John] is sober and he's a safe person, a safe caregiver, [Pamela and her family] would be willing to maintain contact even if they adopt[.]"

8

Dr. Loving reiterated that John maintained custody of Jessica for only three months and that she had spent most of her life residing with Pamela. Dr. Loving noted John's noncompliance with the services offered to him and "intermittent or sporadic" drug use since Jessica's removal. Dr. Loving concluded to a reasonable degree of psychological certainty that: (1) John exhibits no signs of a major mental health issue, other than substance abuse, and has no intellectual limitations that would stand in the way of parenting; (2) John poses a risk in terms of substance abuse, specifically as to cocaine; and (3) there are other areas of potential risk, including child abuse and domestic violence, which "may or may not be barriers to safe reunification" but "the Division has not been able to assess fully and rule out because of [John's] non-cooperation and his lack of candor over the past two years." Like Blocker, Dr. Loving saw John "as being basically at square one . . . in terms of reunification efforts, having not completed any services to help ensure that he has addressed whatever substance abuse problem he has and . . . to make sure those other areas are not barriers to reunification." Defendant did not testify or call any witnesses.

After considering the testimony and documents admitted into evidence, the trial court judge entered the guardianship judgment that ordered termination of defendant's parental rights. In her oral decision placed on the record on

September 18, 2018 and September 20, 2018, the judge found that the Division had proven all four prongs of the best interests of the child test, N.J.S.A. 30:4C-15.1(a), and that termination of defendant's parental rights was in Jessica's best interests.

The judge found that prong one was satisfied by John leaving Jessica alone in the motel room; later violating the SPP, which created a "clear" risk of harm to Jessica; the allegations of domestic violence between John and Vivian; and John's unabated drug abuse. The judge found that the Division proved prong two because John "never took the need for services seriously." He failed to complete any assessments or treatments aimed at addressing his substance abuse and parenting issues, and frequently missed scheduled visits.

Regarding prong three, the judge found that "the Division's efforts were very reasonable in this matter." The Division "ha[d] a very good initial plan" that included multiple referrals for the services John required. In terms of exploring other alternatives, the judge stated that Pamela "is somebody [John] wanted and requested the Division to look at twice," and that the Division considered KLG.

The judge found the fourth prong to be proven based on Dr. Loving's unrefuted conclusion from his bonding evaluations that Jessica would not suffer

more harm than good as a result of termination and that Jessica shared a very close, loving bond with Pamela. The judge also noted that Jessica's exhibited "resilience is already grounded on what her aunt has done to care for" her, and that Pamela supports Jessica visiting with John.

On appeal, defendant argues the following points:

POINT I

THE APPELLATE DIVISION MUST REVERSE THE JUDGMENT OF GUARDIANSHIP BECAUSE DCPP FAILED TO PROVE THAT THE FATHER'S RELATIONSHIP WITH HIS CHILD WAS HARMFUL NOR THAT TERMINATION OF PARENTAL RIGHTS AND ADOPTION BY THE MATERNAL GREAT AUNT WOULD SERVE THE CHILD'S BEST INTERESTS.

A. J.T.B. HAS NOT HARMED HIS CHILD WITHIN THE MEANING OF N.J.S.A. 30:4C-15.1(a)(1).

B. THE TRIAL COURT'S DECISION THAT THE SECOND PRONG OF THE STATUTE WAS SATISFIED WAS NOT SUPPORTED BY SUBSTANTIAL, CREDIBLE EVIDENCE.

C. THE RECORD DOES NOT CONTAIN SUFFICIENT EVIDENCE TO SUPPORT A FINDING THAT DCPP MET ITS BURDEN OF PROOF UNDER THE THIRD PRONG OF THE STATUTE.

1.    DCPP MADE NO EFFORT TO OFFER SERVICES IN PENNSYLVANIA WHERE J.T.B. RESIDED.

2.    THE TRIAL COURT DID NOT PROPERLY CONSIDER ALTERNATIVES TO TERMINATION OF J.T.B.'S PARENTAL RIGHTS.

D.    THE CONCLUSION THAT TERMINATION WOULD NOT DO MORE HARM THAN GOOD WAS NOT SUPPORTED BY THE EVIDENCE.

On appeal, our review of the trial judge's decision is limited. We defer to her expertise as a Family Part judge, Cesare v. Cesare, 154 N.J. 394, 412 (1998), and we are bound by her factual findings so long as they are supported by sufficient credible evidence. N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279 (2007) (citing In re Guardianship of J.T., 269 N.J. Super. 172, 188 (App. Div. 1993)).

Parents have a constitutionally protected right to the care, custody, and control of their children. Santosky v. Kramer, 455 U.S. 745, 753 (1982). "The rights to conceive and to raise one's children have been deemed 'essential,' 'basic civil rights . . . ,' and 'rights far more precious . . . than property rights.'" Stanley v. Illinois, 405 U.S. 645, 651 (1972) (alterations in original) (citations omitted). "[T]he preservation and strengthening of family life is a matter of public concern

as being in the interests of the general welfare . . . ."  N.J.S.A. 30:4C-1(a); see also In re Guardianship of K.H.O., 161 N.J. 337, 347 (1999).

The constitutional right to the parental relationship, however, is not absolute.  K.H.O., 161 N.J. at 347.  At times, a parent's interest must yield to the State's obligation to protect children from harm.  N.J. Div. of Youth & Family Servs. v. G.M., 198 N.J. 382, 397 (2009); In re Guardianship of J.C., 129 N.J. 1, 10 (1992).  To effectuate these concerns, the Legislature codified a test for determining whether a parent's rights must be terminated in the child's best interests.  N.J.S.A. 30:4C-15.1(a) requires that the Division prove by clear and convincing evidence the following four prongs:

> (1) The child's safety, health or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;
>
> (3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

See also N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 604-11 (1986).

Applying these guiding principles, we conclude from our review of the record that the trial judge's factual findings are fully supported by the evidence and, in light of those facts, her legal conclusions are unassailable. We also conclude that defendant's arguments challenging the judge's determinations are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0543-18T2