# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2373-17T1

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

    Plaintiff-Respondent,

v.

C.C.-R.,

    Defendant-Appellant,

and

E.R.,

    Defendant.

_____

IN THE MATTER OF N.R.,

    Minor.

_____

Submitted March 5, 2019 – Decided August 5, 2019

Before Judges Rothstadt and Natali.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Monmouth County, Docket No. FN-13-0043-17.

Joseph E. Krakora, Public Defender, attorney for appellant (Fabiola E. Ruiz-Doolan, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Jason W. Rockwell, Assistant Attorney General, of counsel; Joann M. Corsetto, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor N.R. (Noel C. Devlin, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendant C.C.-R. (Clair)[1] appeals from the Family Part's December 14, 2017 order finding that she abused or neglected her daughter N.R. (Nancy) under N.J.S.A. 9:6-8.21(c) (Title Nine) based on her neglect of Nancy's medical needs, the presence of gasoline fumes in the home, which placed Nancy at a substantial risk of harm, and Clair's subsequent involuntary commitment rendering her unable to provide for Nancy's needs.[2] On appeal, Clair argues that plaintiff, the

---

[1] To protect privacy interests and for ease of reading, we use initials and fictitious names for the parents and children. R. 1:38-3(d)(12).

[2] Despite the Family Part's finding, it ordered that Clair not be placed on the state Child Abuse Registry.

A-2373-17T1

Division of Child Protection and Permanency (Division) failed to establish by a preponderance of the evidence that she possessed adequate mental capacity to be culpable under the Title Nine. We affirm, substantially for the reasons expressed in Judge Teresa Kondrup- Coyle's oral decision placed on the record on the same date she entered the order under appeal.

Clair is the biological mother of Nancy, who was nine years old at the time of the Division's initial investigation. On July 1, 2016, the Division received a referral from E.R. (Eduard), Nancy's biological father, who was concerned about Nancy's safety as a result of the home she shared with Clair in Neptune, which he described as being "in disarray," as well as about Clair's mental health. Eduard, who had been residing in Oklahoma since 2009, stated that Nancy had been diagnosed with ADHD and that Clair had not taken her to the doctor and had forbidden Eduard from doing so.

On that same day, a Division caseworker reported to Clair's home to investigate. During the caseworker's interview with Clair, she "appeared paranoid" but coherent. Clair stated that Nancy was homeschooled but was unable to produce any school-related paperwork or curriculum. When asked if Nancy had any special needs or developmental delays, Clair explained that she had speech delays due to hearing issues, but would not provide the name of

A-2373-17T1

Nancy's pediatrician due to privacy concerns. The caseworker asked several times for the pediatrician's name and informed Clair that the information would be kept private, but was unsuccessful in obtaining it, as Clair offered only that "[Nancy] was receiving the appropriate medical care . . . ." The caseworker asked Clair to see the rest of her home, where he did not observe anything of note aside from a lawnmower and other lawn supplies in one of the bedrooms. The caseworker also spoke to Eduard, who reiterated his concern for Nancy's well-being and stated that Clair has struggled with her mental health since Nancy's birth, during which Clair nearly died.

Later that month, the caseworker contacted the Neptune Board of Education, which had no registration for Nancy on file. Approximately one week after that, on July 14, 2016, caseworkers again visited Clair's home. Clair again refused to share information regarding Nancy's pediatrician, expressing privacy concerns, but showed the caseworker an up-to-date immunization and medical exam record for Nancy, which also showed the name of the pediatric practice group Nancy visited. Caseworkers asked Clair again about Nancy's education and developmental delays. Clair stated that Nancy was receiving an adequate education, dismissed concerns over her developmental delays as shyness, and declined the Division's offers for Nancy to undergo physical and

psychological evaluations, again citing privacy concerns and stating that she would prefer to schedule those appointments without the Division's involvement.

When a caseworker contacted Nancy's pediatrician later that day, he was advised that Nancy was last seen in August of 2012 and was no longer a patient as she had not been there in four years. During that August 2012 appointment, Nancy's pediatrician documented her developmental delay. Previously, in May 2011, the pediatrician also noted Nancy's developmental delay and documented concerns with her limited vocabulary. As a result of that visit, Nancy was referred to a specialist to work on these issues, which Clair refused twice.

Caseworkers visited Clair's home again for a second time on July 14, 2016, and advised Clair that she needed to call Perform Care, a program that would address Nancy's developmental delays, while the workers were present. Clair became argumentative and started speaking about privacy concerns, but then agreed to call and was told that Perform Care could only help Nancy after she received a diagnosis from a pediatrician or specialist. After the Division caseworker spoke to Clair about making a pediatrician appointment for the next day and stated that Nancy had not been to the pediatrician since 2012, Clair

"became combative once again," but then agreed to call the pediatrician the next morning.

The next morning, Clair called the caseworker and stated that she attempted to make a pediatrician appointment but the doctor could not see Nancy until the next week. When asked, Clair would not provide the day and time of Nancy's appointment. The caseworker then advised Clair that the Division would be filing a complaint for the care and custody of Nancy.

On July 27, 2016, a caseworker made an unannounced visit to Clair's home and immediately noticed "a strong odor of gasoline." The caseworker also noticed "a hole in the ceiling of one of the rear bedrooms that exposed the inside of the home straight to the outside," mold that "appeared black," and "padlock and deadbolt style locks on the inside of each one of the interior doors going to each room." The locks were on "every single bedroom, bathroom" and other door, and the windows were covered with paper.

The caseworker attempted to investigate the gasoline odor and observed a lawnmower in the laundry room that is connected to the kitchen, but the odor did not appear to be coming from it. In a bedroom connected to the living room, the caseworker experienced "an extremely strong odor of gasoline," and observed a lawnmower, other gardening tools, and "a red container of gasoline

in a bag, [which Clair] stated that she keeps . . . in the home as well." Clair opened the sliding door to remove the gasoline can, which revealed a fire pit that was approximately four feet from the home and appeared to have just been put out. Clair was unable to provide a reason why a fire pit had been burning during the day and placed the gasoline can less than a foot away from the pit before the caseworker moved it. The caseworker also asked Clair to remove the lawnmower as it was unsafe for her and Nancy to breathe the fumes, and Clair stated that she did not smell anything and did not want to leave the lawnmower outside for fears of vandalism.

At that point, the caseworker contacted the police and fire department. The fire chief concluded that the home needed to be completely ventilated and Kevin Devlin, the Deputy Coordinator of Emergency Management and a HAZMAT technician, opined that it was not safe for the family to remain in the home at that time. The fire chief also stated that the department had been called to Clair's home previously when she was burning household items in an illegal fire pit. Fire department workers were also concerned that the home contained black mold.

Immediately after that, a screener from Monmouth Medical Center arrived to the home to assess Clair after police officers agreed she "appeared to be

paranoid and delusional." The screener opined that Clair should be fully evaluated at the hospital, at which point workers advised Clair that the Division would be taking custody of Nancy. The Division conducted a Dodd removal that same day.[3] Nancy was placed in a Division-approved resource home and Clair was involuntarily committed for psychiatric treatment after being diagnosed with bipolar disorder and psychosis, and later transferred to involuntary inpatient treatment.

On July 29, 2016, the Division filed a verified complaint and order to show cause for custody of Nancy. The Division noted its concern with Nancy's well-being due to Clair's paranoia, Nancy's struggles to form sentences and interact with people other than her parents, and lack of medical care or adequate education. Judge Kondrup-Coyle granted the Division's application that day and ordered Clair to submit to a psychological and psychiatric evaluation following her hospitalization and that any evaluations related to Nancy be arranged on an expedited basis.

---

[3] A Dodd removal is an emergency removal of a child from a parent's custody without a court order, as authorized by the Dodd Act, N.J.S.A. 9:6-8.29. N.J. Div. of Child Prot. & Permanency v. T.U.B., 450 N.J. Super. 210, 215 n.2 (App. Div. 2017).

Nancy underwent a psychological evaluation on August 8, 2016. The psychologist found that Nancy presented with "many functional challenges which appear to be due to a likely disorder on the Autis[m] Spectrum." Nancy also presented signs of Obsessive-Compulsive Disorder, Posttraumatic Stress Disorder, and "developmental delays." The doctor was also concerned about the "impact of [Clair's] mental health issues/modeling on [Nancy's] functioning." The doctor found Nancy's communication abilities to be "very limited" as she was "largely nonverbal," and noted reports of Nancy having "extreme fear reactions" to strangers or being approached even in a benign manner.

Clair underwent a psychological evaluation on August 16, 2016. The doctor diagnosed Clair with an Unspecified Psychotic Disorder, concluded that Clair "continue[d] exhibiting symptoms of paranoia and thought disorder that have impeded her capacity to sufficiently assess her environment and allow her daughter to receive relevant medical and educational services." He did not recommend her as an "independent caretaker" for Nancy and referred her for treatment to support her emotional stability. Specifically, the doctor directed that Clair be admitted to "an outpatient partial hospitalization program" in which she could receive treatment that would enable her to "demonstrate appropriate reality orientation."

A nonconsecutive three-day factfinding hearing followed. Officer Kristopher Daly testified for the Division and described the state of Clair's home, including the strong odor of gasoline, on the day Nancy was removed. Kevin Devlin also testified for the Division regarding the consequences of the black mold found at Clair's home and the events that transpired on the day it was discovered. At the end of the first day of the hearing, the trial judge addressed Eduard's request to have custody of Nancy transferred to him in Oklahoma, which she granted.[4]

On the second day of the hearing, Division caseworker Michael Grisanti testified for the Division and described the poor condition of Clair's home and the items found inside, the difficulties he experienced while attempting to talk to Clair, and the Division's concerns regarding Nancy's lack of medical care and Clair's mental health. Finally, on the third day of the hearing, Division caseworker Stacy Jackson, who became involved in the case after Nancy was placed in her non-relative resource home, testified for the Division. Jackson indicated that at that point, Clair had not complied with seeking any mental health treatment in response to the court's previous order, had not indicated that

---

[4] At the conclusion of the litigation, on December 14, 2017, the judge entered an order relinquishing jurisdiction to Oklahoma, where Nancy resided with her father.

A-2373-17T1

she would take psychiatric medication, and did not appear to understand the results of her psychological evaluation. Jackson also stated that she visited Clair's home in November 2016 and February 2017 and the conditions that led to Nancy's removal had not yet been ameliorated. After that, Clair represented to Jackson that the issues had been taken care of, but did not allow Jackson to visit the home and verify that was true. When Jackson visited the home in September 2017, she discovered a letter on the door stating that Clair had been evicted. Jackson had since experienced difficulty in getting in touch with Clair.

Jackson also testified that Nancy had been receiving various services in Oklahoma, including having an individualized education plan (IEP) and undergoing occupational therapy, individual therapy, and an autism evaluation. Nancy was "doing wonderful[ly] in her father's care" and the guidance counselor at Nancy's school indicated that she had been doing "very well" especially in light of what she had experienced while residing with Clair. Nancy had also begun visiting a pediatrician. Clair presented no witnesses on her behalf.

At the conclusion of the hearing, Judge Kondrup-Coyle placed her decision on the record. The judge found all of the witnesses to be credible and that Clair put Nancy at a substantial risk of harm and failed to exercise a minimum degree of care based upon on the state of her home at the time of

11

Nancy's removal. The judge found that regarding those risks of harm, Clair "was conscious enough and understood it enough" in spite of her mental health struggles. The judge noted Nancy's developmental delays, lack of medical care, that she was dressed inappropriately for the weather on the day of her removal, and that the windows in Clair's home were covered in black paper with "no light coming in." To the trial judge, "[t]he simple fact that [Clair] failed to follow-up on [Nancy's] medical needs is enough . . . in this case. That was an affirmative decision. Everything else is just, quite frankly, added on."

On December 14, 2017, the judge issued an order memorializing her finding by a preponderance of the evidence that Clair abused or neglected Nancy under Title Nine. The judge's decision was based on her conclusions that Clair failed to follow up both on Nancy's medical needs for four years and the 2012 recommendation for an evaluation to determine whether Nancy had any developmental delays; the condition of Clair's home including the presence of gasoline and toxic fumes that placed Nancy at risk of harm; and Clair's involuntary commitment, as a result of which she was not able to provide for Nancy's needs. This appeal followed.

On appeal, Clair argues the following points:

POINT I:

CLAIR'S CONDUCT WAS NOT WILLFUL OR WANTON WITHIN THE PURVIEW OF TITLE 9. CLAIR'S SERIOUS MENTAL ILLNESS PREVENTED HER FROM TAKING CARE OF NANCY WHICH WARRANTED THE DCPP'S INVOLVEMENT UNDER N.J.S.A. 30:4C-12.

    A. CLAIR'S MENTAL ILLNESS PREVENTED HER FROM HAVING THE AWARENESS OF AN ORDINARY PERSON.

    B. NANCY WAS NOT IN IMMINENT DANGER OF IN A SUBSTANTIAL RISK OF BEING HARMED.

POINT II:

NANCY WAS A CHILD IN NEED OF SERVICES UNDER N.J.S.A. 30:40C-12 (ISSUE NOT RAISED).

Our standard of review on appeal is well-settled. We are bound by the Family Part's factual findings if supported by sufficient credible evidence. N.J. Div. of Youth & Family Servs. v. I.H.C., 415 N.J. Super. 551, 577-78 (App. Div. 2010). We accord particular deference to the family court's fact-finding because of the court's "special expertise" in family matters, its "feel of the case," and its opportunity to assess credibility based on witnesses' demeanor. N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008); Cesare v. Cesare, 154 N.J. 394, 412-13 (1998).

Under N.J.S.A. 9:6-8.21(c)(4), an abused or neglected child is:

> [A] child whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent . . . to exercise a minimum degree of care (a) in supplying the child with adequate food, clothing, shelter, education, medical or surgical care though financially able to do so or though offered financial or other reasonable means to do so, or (b) in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof[.]

The Division "must prove that the child is 'abused or neglected' by a preponderance of the evidence, and only through the admission of 'competent, material and relevant evidence.'" N.J. Div. of Youth & Family Servs. v. P.W.R., 205 N.J. 17, 32 (2011) (quoting N.J.S.A. 9:6-8.46(b)). The statute requires a court to consider harm or risk of harm to the child, as opposed to the intent of the abuser, because "[t]he main goal of Title [Nine] is to protect children 'from acts or conditions which threaten their welfare.'" G.S. v. Dep't of Human Servs., 157 N.J. 161, 176 (1999) (quoting Stave v. Demarest, 252 N.J. Super. 323, 330 (App. Div. 1991)).

We turn first to Clair's argument that her "conduct was not willful or wanton" and her "serious mental illness prevented her from taking care of Nancy." In general, the mental illness of a parent may create an environment in

which the parent is incapable of safely caring for his or her children. N.J. Div. of Youth & Family Servs. v. A.G., 344 N.J. Super. 418, 439 (App. Div. 2001). Nonetheless,

> [m]ental illness, alone, does not disqualify a parent from raising a child. But it is a different matter if a parent refuses to treat his [or her] mental illness, the mental illness poses a real threat to a child, and the other parent . . . is unwilling or incapable of following court orders to shield [his or] her child from that danger.
>
> [N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 450-51 (2012).]

However, a parent need not "act with a willful or purposeful intent to commit child abuse" in order to be found culpable under Title Nine. G.S., 157 N.J. at 177. Proof that a parent's "actions were inadvertent and she did not intend to harm" a child does not preclude a finding of abuse or neglect. Ibid. A parent "fails to exercise a minimum degree of care when he or she is aware of the dangers inherent in a situation and fails adequately to supervise the child or recklessly creates a risk of serious injury to that child." Id. at 181. "At the very least, a minimum degree of care means that a parent's conduct must be 'grossly negligent or reckless.' In contrast, a parent's negligent conduct is not sufficient to justify a finding of abuse or neglect under [Title Nine]." N.J. Div. of Child Prot. & Permanency v. Y.N., 220 N.J. 165, 180 (2014) (citation omitted). See

also <u>Dep't of Children & Families, Div. of Youth & Family Servs. v. T.B.</u>, 207 N.J. 294, 307 (2011) (holding that a parent who "acts in a grossly negligent or reckless manner" may place a child at risk of future danger, but "where a parent is merely negligent there is no warrant to infer that the child will be at future risk"). Here, as the trial judge found, Clair's mental illness did not prevent her from being aware of the risk of harm to Nancy, and Clair's actions were more than "merely negligent."

Moreover, although Clair's mental health issues alone cannot form the basis of a finding of abuse and neglect, the other facts present in this case, including Nancy's lack of proper medical care and lack of education, and the presence of toxic fumes and mold in Clair's home, were supported by the record and the testimony at the hearing and formed the basis of the trial judge's decision. We therefore affirm substantially for the reasons set forth by Judge Kondrup-Coyle in her oral decision. As to Clair's remaining arguments, we conclude that they are without sufficient merit to warrant discussion in a written opinion. <u>R.</u> 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2373-17T1